LEVI STATON v. BOYD F. BRYANT ET AL.

| 55 | 261 |
| 72 | 371 |
| 72 | 431 |
| 72 | 1071 |
| 55 | 261 |
| 78 | 465 |
| 55 | 261 |
| 82 | 262 |

1. ESTOPPEL. *In pais. The principle thereof.*
   The principle on which the doctrine of estoppel by conduct rests is that it would be a fraud in a party to assert what his previous conduct had denied, when, on the faith of that denial, others have acted.

2. SAME. *In pais. How arises.*
   Estoppel by conduct arises from an act or declaration of a person intended or calculated to mislead another, on which that other has relied, and has so acted, or refrained from action, as that injury will befall him if the truth of the act or declaration be denied.

3. SAME. *In pais. Silence.*

When silence becomes a fraud, it will operate as an estoppel. But no precise definition of fraud has been attempted by equity, lest knavish ingenuity should avoid it — each case in which the doctrine of estoppel by conduct is invoked being left to be determined by its own peculiar circumstances.

4. SAME. *Purchase with constructive notice of title. Owner not estopped.*

The purchaser of land will be regarded as knowing the condition of the title thereto if it be a matter of record, and a court of equity will not estop the holder of the paramount legal title from asserting his rights, although the purchaser, at the time of his purchase, and for many years thereafter, was ignorant of the existence of such paramount title, and the owner thereof, being aware of such ignorance on the part of the purchaser, and being related to him and a near neighbor of his, remained silent, allowing the purchaser to treat the land as his own; but in such case, where the purchaser has relieved the land of incumbrances in favor of third persons, and has forborne to enforce a lien against the same in his own favor, the court will only allow the owner of the paramount legal title to assert his claim to the land upon the condition of restoring the *statu quo*, and will not permit him to take the land disincumbered, or to gain any advantage by the lapse of time.

5. ACCOUNT. *Rents. Bona-fide purchaser. Case in judgment.*

Where a purchaser of land, having bought in good faith and in ignorance of a paramount title, though having constructive notice thereof, entered into possession and occupied the same as owner for several years, without objection or claim of title by the paramount owner, a court of equity, in ordering an account of rents, after a contest has arisen, will require the commissioner to ascertain and report the rent from the time the purchaser went into possession to the commencement of the action against him, as if upon one lease for the whole term to a responsible tenant with undoubted security, who would pay the rent promptly at the end of each year without resort to legal proceedings, and with the obligation on his part to keep the premises in such repair as was necessary for the convenient use and occupation of the same; and such rent shall be estimated at what the land would readily have brought, without any further effort on the part of the lessor to secure a tenant than giving notice in the neighborhood that the land was for rent. For all years after the commencement of the action against the purchaser in such case the rent shall be estimated as on a yearly leasing, but in other respects according to the above principles. The commissioner shall ascertain and report the value of all permanent improvements as they exist at the time of stating the account; but the rent shall not be increased, at any time, on account of the same.

APPEAL from the Chancery Court of Tallahatchie County. Hon. J. N. CAMPBELL, Chancellor.

The case is stated in the opinion of the court.

*Fitz-Gerald & Marshall* and *W. S. Eskridge*, for the appellant.

The appellant is not bound by the sale to Bryant, unless by his conduct he is estopped from setting up his title to the land. To constitute estoppel by conduct, the following elements must be present: (1) there must have been a representation, or concealment, of material facts; (2) the representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of the matter; (4) it must have been made with the intention that the other party should act upon it; (5) the other party must have been induced to act upon it. Big. on Estop., 2d ed., 437; *Turnipseed* v. *Hudson*, 50 Miss. 436. Not one of the above elements is presented, as we conceive, in the case at bar.

Estoppel does not apply where one buys with a knowledge or notice of the true title. Story's Eq. Jur., 5th ed., secs. 386, 395; 2 Smith's Ld. Cas., 5th Am. ed., 662; 2 Pars. on Con. 796, note *r*; *Charr* v. *Calvert*, Walk. 54; *Brant* v. *Virginia Coal and Iron Co.*, 3 Otto, 326, and authorities cited; *Hill* v. *Eppley*, 7 Casey, 33. The doctrine or principle of estoppel *in pais*, or rather, the branch of estoppel by conduct, or an equitable estoppel, rests entirely upon the idea of fraud or wrong or injury perpetrated by the party who subsequently attempts to set up rights against the party wronged or injured.

Of what act has the appellant been guilty, which has injured or wronged Bryant in this transaction? He in nowise encouraged Bryant to purchase; he in no way mislead him as to his title; he did not stand by in silence and see his brother sell appellant's land to Bryant, for, as before stated, the proof is full and ample that the land had been sold and conveyed to Bryant by Arthur, and Bryant had gone into possession under this purchase before the appellant had any notice whatever of the sale. And from Bryant's own deposition it appears manifest that his purchase was made with full, actual notice of appellant's title to an undivided half-interest in the land.

We believe that no authority can be found in the books which, under the above state of facts, warrants the doctrine of

estoppel against the appellant. Before he can be deprived of his estate he must in some manner have so acted as to mislead Bryant to his prejudice. This is the doctrine of all the cases from *Pickard* v. *Sears*, 6 Ad. & E. 115, to the present time. Story's Eq., secs. 386, 391, 393 ; *Niver* v. *Bastroop*, 2 Johns. 573 ; *Stans* v. *Barker*, 6 Johns. Ch. 167 ; *Dezell* v. *Odell*, 3 Hill, 215 ; *Reynolds* v. *Lounsburg*, 6 Hill, 534 ; 2 Smith's Ld. Cas. 660–662 ; *Welland Canal Co.* v. *Hathaway*, 8 Wend. 480 ; Big. on Estop. 431, 432, 450, 453 (and note 1), 462, 463, 467.

It was the duty of Bryant, as it is the duty of all persons purchasing lands, to examine the proper records to ascertain if there had been a previous sale. 3 Story's Eq. 403, 419, note ; *Leonard* v. *Corley*, 43 Miss. 706 ; *Rice* v. *Dewey*, cited in Big. on Estop., 2d ed., 466 ; Code 1857, p. 389, art. 20. Did appellant's silence mislead or deceive Bryant to his prejudice ? Certainly not, for Bryant knew the true state of the title when he purchased. Did appellant deceive or mislead Bryant by making no objection to Bryant's taking possession and cultivating the land ? We think not, for Bryant had full knowledge of appellant's rights, and had himself acted in bad faith toward appellant in the purchase of his land. Nor has appellant prejudiced his right to recover the land by his delay to bring his action of ejectment, especially when he has given a good reason for the delay. The following authorities, we believe, sustain us fully in this position : *Dick* v. *Balch*, 8 Pet. 30 ; Story's Eq., secs. 386, 388, 390, 395 ; 2 Smith's Ld. Cas. 662 ; *Muly* v. *Collins*, 10 Am. Law Rep. 279 ; 41 Cal. 663 ; *Welland Canal Co.* v. *Hathaway*, 8 Wend. 480 ; *Seymour* v. *Page*, 33 Comst. 61 ; Big. 467, 492 ; *Liverpool Wharf* v. *Prescott*, cited in Big. 467 ; *Thayer* v. *Bacon*, 3 Allen, 163 ; *Brewer* v. *Boston & Worcester R. R. Co.*, 5 Metc. 478, cited in Big. 467 ; *McCormac* v. *Barnum*, 10 Wend. 104 ; *Adams* v. *Rockwell*, 16 Wend. 285 ; *Hagey* v. *Detweiler*, 35 Penn. 409 ; *Columbet* v. *Pachico*, 48 Cal. 395. In the case of *Railroad Company* v. *DuBois*, 12 Wall. 47, Justice Story, who

delivered the opinion of the court, on page 64 uses this language: "No principle is better settled than that a party is not estopped by his silence, unless it has misled another to his hurt." See, also, *Walker* v. *Walker*, 9 Wall. 744; *Wilie* v. *Brooks*, 45 Miss. 542.

*W. H. Fitz-Gerald*, of counsel for appellant, argued the case orally.

*Golladay & Freeman*, for the appellees.

"It is a universal rule of law that if a man, either by words or conduct, has intimated that he consents to an act which has been done, and that he will offer no opposition to it, although it could not have been lawfully done without his consent, and he thereby induces others to do that from which they might have abstained, he cannot question the legality of the act he had so sanctioned, to the prejudice of those who have so given faith to his words, or to the fair inference to be drawn from his conduct." Big. on Estop. 463, 518, 525.

"If a party has an interest to prevent an act being done, and acquiesces in it, so as to induce a reasonable belief that he consents to it, and the position of others is altered by their giving credit to his sincerity, he has no more right to challenge the act to their prejudice than he would have, had it been done by his previous license." Story's Eq. Jur., sec. 1546. See, also, *Continental National Bank* v. *National Bank of the Commonwealth*, 50 N. Y. 575; *Knights* v. *Wiffin*, 5 Law Rep. Q. B. 66; Big. on Estop. 571; *Smith* v. *Smith*, 30 Conn. 111.

"When an act produces conduct from which flows injury, it cannot matter whether that conduct be affirmative or negative, active or quiescent." Story's Eq. Jur., sec. 586. "In *Howard* v. *Hudson*, Lord Campbell, C. J., recognizes the existence of the principle that doing an act and omission to act are the same." *Ib.*, secs. 584, 585.

"It is not necessary to an equitable estoppel that the party should willfully intend to mislead, nor that the party who claims the estoppel shall have acted affirmatively upon it. It is enough if he have been induced thereby to refrain from such action as lay

in his power, by which he might have retrieved his position and saved himself from loss." *Voorhees* v. *Olmstead,* 10 N. Y. 744, 754; affirmed on appeal, 66 N. Y. 113.

It is certain that the owner of the land may by his conduct and words estop himself, though a purchaser may be fully apprised of the state of the title. The conduct and words of the owner being ascertained, the sole question is, Do they amount to an equitable estoppel, or an estoppel *in pais?* If so, no more efficiency can be claimed for constructive knowledge by a recorded deed than to actual knowledge of title. 12 Metc. 494; 12 Pick. 40–42; *Markham* v. *O'Connor,* 21 Am. Law Rep. 249; 52 Ga. 183; *Tobin* v. *Allen,* 53 Miss. 563. There are cases cited for the proposition that, when the title has been duly recorded, it may be fairly presumed that subsequent purchasers used the means pointed out by law to acquire all the knowledge which it is important for them to know. But "when the owner is directly apprised of the ignorance of the buyer, he can hardly claim the benefit of this principle, because good faith then required him to correct the error." Kerr on Fraud, 131; *Carr* v. *Wallace,* and *Epley* v. *Witherow,* 7 Watts.

"It is well settled that a man cannot lawfully keep silent when it is his duty to speak, to prevent a wrongful use of his property or credit, to the injury of an innocent third person. He cannot be permitted to keep silent when he knows that his property is being fraudulently sold by another as his own, without warning the innocent purchaser." *Winston* v. *Hart,* 39 Conn. 20; Story's Eq. Jur., 10th ed., sec. 385; *Dickson* v. *Green,* 24 Miss. 612; *Nixon* v. *Carso,* 28 Miss. 414.

If one negligently "stand by" and suffer another to act under an impression that he could contradict, he will be estopped. *Gregg* v. *Wells,* 10 Ad. & E. 90; *Roe* v. *Jerome,* 18 Conn. 138–153; *Taylor* et al. v. *Ely,* 25 Conn. 250, 251. "Standing by" ("presence" has some import) is used in law as implying knowledge under such circumstances as render it the duty of the possessor to communicate it." *State*

v. *Holloway*, 8 Blackf. 47 ; 6 Ind. 289 ; 41 N. H. 385, 386.
One will be estopped if his acts, admissions, or representations.
were intended or calculated, or might be reasonably expected,
to influence the conduct of another, and does so influence his
conduct, and he would be prejudiced if the acts and admis-
sions were allowed to be retracted.  *Horne* v. *Cole*, 51 N. H.
287 ; *Miller* v. *Pounder*, 55 N. Y. 334, 335 ; *Brown* v. *Bowen*,.
30 N. Y. 541 ; Big. on Estop., ed. 1872, p. 600.

 *Harris & George*, on the same side.

 It is settled that Arthur Staton was bound by the transac-
tion between Bryant and himself, and Levi will be bound, in a
court of equity, by a parol assent given before, at the time,
or after the sale, or by his acquiescence after knowledge of
the sale.  *Joslin* v. *Caughlin*, 32 Miss. 104 ; *Crowder* v.
*Shackleford*, 1 Smed. & M. 208.  This assent was virtually
given by conduct which creates an equitable estoppel to make
any objection.  Levi Staton was under a legal as well as
moral duty — the neglect of which is dishonesty — to dissent.
from the sale to Bryant the moment he was apprised of it, if he
intended to dissent at all.  He disavows the belief that Bryant.
intended any wrong, and this made the duty more imperative.

 Bryant bought under the belief that Levi Staton had re-
linquished his interest to his brother, the executor, and this.
belief, according to the admissions of Levi, had been created
by himself.  He says that Bryant labored under the delusion
that he (Levi) had by a contract relinquished his title ; that
Bryant's own lawyer had drawn up the contract ; that it was a.
matter of notoriety in the town Charleston ; that it was not
his business to disabuse Bryant of this belief.  He does not
produce the contract, but undertakes to get rid of it by saying
it was abandoned.  That abandonment was not notorious, if it.
ever took place.  It was, as he says, simply ignored between
them.  The abandonment was never divulged, and Levi was.
aware of that.

 Levi Staton says that Bryant's mistake arose from the
notoriety of the contract, and from intercourse with those who

knew its character, and, of course, the character of the contract as thus exposed was that of a relinquishment of title. He says that, whilst Bryant thought it was an actual relinquishment, it was merely a promise to relinquish on conditions which had not been fulfilled. If such was the fact, that he knew Bryant was mistaken as to the nature of the contract, and was ignorant of any change or abandonment, it was his legal duty, when he found that Bryant was dealing with Arthur, or the property, under this ignorance and delusion, to go to him and inform him of the true state of the case. The turpitude of the silence which he maintained is heightened when we consider that the intimacy between Levi and Bryant was close and confidential ; that Bryant had been his father's friend and associate in business, and from this very state of their relations no suspicion of wrong would enter Bryant's mind. Their intercourse was friendly and frequent. It grew more frequent and free after Bryant took possession of the property in January, 1868.

We speak with confidence when we assert that an heir or devisee, in the circumstances of this case, is under a legal duty to interpose, at the earliest moment, when apprised of a transaction between a creditor and the executor, by which the property of the estate is being employed in settlement of the debts of the estate, to disclose the obstacle to the settlement, if any exist, especially when that obstacle is the one which is now set up.

The "standing by," in the language of the Court of Chancery, is often employed as a figure of speech, and does not necessarily import an actual presence *dum fervet opus.* It means the omission to act or speak when an occasion arises where to speak or act is a legal duty. The duty is as imperative to arrest the consummation of a contract after it has been entered into as it is to avert the contract. To arrest the execution of the contract while there is time to prevent injury, and when it would be practicable to place the parties *in statu quo,* is a duty of as stringent obligation as is the duty to prevent

the parties from contracting ; and we find it recognized as hav—
ing the same footing.   The case, of *The State* v. *Holloway*, 8·
Blackf. 45, and *Nicholson* v. *Cooper*, 4 Myl. & Cr. 179 (18
Cond. Eng. Ch. Rep. 178), are cases which present pointed
illustrations of fraudulent silence, and of the cases in which
there arises a legal duty to communicate information, or
dissent.

*W. P. Harris*, of counsel for appellees, argued the case·
orally.

CAMPBELL, J., delivered the opinion of the court.

Levi and Arthur Staton were the legatees and devisees of
their deceased father, Harvey Staton.   The close of the late
war between the states found them in possession of 889 acres
of land, the subject of this dispute, the most valuable part of
it being the 16th section, on which are all of the improvements,
it being estimated as worth some $7,000 or more, and the other
land about $1,000.   The slaves having been emancipated, the
personal estate was of little value.   Bryant was a creditor of
Harvey Staton, and obtained two judgments against Arthur
Staton, executor of the will of Harvey Staton, to the aggregate
amount of about $7,000, in November, 1865, which were a lien
on all the personal property of the testator in the hands of
his executor, and on the 16th section mentioned, as well as
a charge upon the other land described, which was liable on
proper proceedings to be sold to pay said judgments.   The
judgments of Bryant were nearly equal in amount to the value·
of the entire estate of Harvey Staton, in the hands of his
devisees and executor when they were obtained.   In the au-
tumn of 1865 a contract was made between Arthur and Levi
Staton, by the terms of which Levi was to renounce all inter-·
est in the real and personal estate of Harvey Staton to Arthur,
for $1,000, to be paid him by Arthur, who was to have the·
whole estate and pay all the debts of Harvey Staton remain-
ing unpaid.   Besides the judgments in favor of Bryant, there·
was due for the purchase-money of the 16th section mentioned·

-over $3,000, Harvey Staton not having paid it, and the trustees still holding his note for it. This contract between Arthur and Levi Staton was reduced to writing, and although it was not recorded, it became somewhat notorious in the community in which they resided. In accordance with its terms, Levi left the plantation and settled on an adjoining place, surrendering to Arthur exclusive possession and control of the ancestral estate. In 1865 Arthur paid $1,000 on Bryant's judgments. In 1866 and 1867 Arthur managed the estate in his own interest, and paid $2,000 on Bryant's judgments, on which no executions had been issued. Levi continued to reside on the place close by. To all appearances the conduct of Levi and Arthur was conformable to the arrangement which had been made between them for the exclusive ownership of the estate by Arthur. Everything was given up to Arthur, and Levi did not concern himself about the matters of the estate. Indeed, there was never any allusion between the brothers to the contract they had made in 1865. It was never in terms revoked. On July 26, 1867, Arthur Staton made a deed conveying to Belcher an undivided one-half interest in all of said estate land, for a consideration of $2,000, recited in the deed as received, which was filed for record November 13, 1867. This proved to have been a " sham " deed, in the language of the witness Belcher. On October 23, 1867, Arthur made a deed conveying one-half interest in the same land to Levi, for the consideration of $10 paid, and to secure " a certain promissory note executed by the said Arthur Staton to the said Levi Staton, for $1,000, sometime in the year 1865, the exact date not being known, and for the further consideration that the said second party (Levi) shall always provide for the said first party a comfortable home, with suitable clothing and food, according to his station in life, during the first party's natural life." This deed was filed for record November 15, 1867. Why this deed was made was not known to Levi, who had no knowledge of its being made until it was shown to him, with the inquiry if it was satisfactory to him.

About the close of 1867 negotiations were had between Arthur Staton and Bryant for the sale to Bryant of the estate land to pay Bryant's judgments, and for him to pay what was due on the 16th section. Bryant learned of the deed which Arthur had made to Belcher, and insisted that the land should be reconveyed by Belcher to Arthur before he would buy it, and on January 1, 1868, Belcher conveyed it to Arthur. Bryant agreed with Arthur to take the land for his judgments, and to pay the debt due to the trustees of the 16th section, and on January 18, 1868, Arthur conveyed the land to the grandchildren of Bryant, as he directed, and Bryant caused his judgments to be entered satisfied, except as to costs, and Bryant entered into possession of the plantation, and cultivated it under a joint arrangement with Arthur to farm it together until June, 1868, when Arthur abandoned the joint operations, and left Bryant in sole possession and control, who thenceforth occupied it exclusively. Soon after the sale by Arthur, Levi was informed of it, and this led to some estrangement between him and Arthur. Arthur determined to leave the country, and told Levi there was some personal property of their father's estate on the plantation, which he had better send over and get, and he did so, and Arthur left, after having made Levi's house his house for some weeks. Bryant was frequently at Levi Staton's house after the purchase from Arthur, and frequently met and talked with Levi, and sometimes about the land purchased of Arthur. Levi never complained to Bryant of what Arthur had done, nor asserted any claim to the land, nor intimated any objection to the arrangement made between Arthur and Bryant. On February 18, 1869, Bryant gave his note to the trustees of the 16th section for what was due on it, and subsequently he paid the sum due by the note, except a trifling balance. Bryant continued to occupy, cultivate, and control the plantation for the benefit of his grandchildren, without any expression of dissatisfaction by Levi until September 1873, when he instituted his action of ejectment for

the land, and Bryant and his grandchildren exhibited this bill
to enjoin Levi from prosecuting his ejectment.

The principle on which the doctrine of estoppel by conduct
rests is that it would be a fraud in a party to assert what his
previous conduct had denied, when on the faith of that denial
others have acted.    When silence becomes a fraud, it will oper-
ate as an estoppel.    Estoppel by conduct " arises from an act,
or declaration of a person intended or calculated to mislead
another, on which that other has relied, and has so acted, or
refrained from action, as that injury will befall him if the
truth of the act or declaration be denied."    *McMaster* v.
*Insurance Co.*, 55 N. Y. 222.

The conduct of Levi Staton was well calculated to create the
belief that he had relinquished all claim on the estate of Har-
vey Staton, and that Arthur was authorized to dispose of it as
he did.    The estate was incumbered with debts nearly, if not
quite, sufficient to consume it.    The real interest of Levi was
small, if anything, in value, being contingent on the payment
of the debts of the estate.    The chief part of the estate was
liable to sale, under execution, upon the judgments of Bryant,
as well as exposed to proceedings by the trustees for the pur-
chase-money of the 16th section, and all of the land was liable
to be sold, on proper proceedings, to pay Bryant's judgments.
Levi had relinquished his interest to Arthur, and Bryant with-
held execution of his judgments to give opportunity to Arthur
to pay them as he could.    Instead of resorting to a forced
sale, as he might have done, Bryant concluded a fair purchase
of the estate from Arthur.    Having done this, he assumed
control of the estate as his, subject to the paramount charge
on the 16th section.    Levi knew Bryant had contracted with
Arthur for the land in the belief that Levi had no claim upon
it.    He must have known that Bryant was, in fact, ignorant
of the deed Arthur had made to him, and that Bryant, as a
creditor who had a claim on the estate superior to that of
devisees, had accepted the conveyance of the land as a satis-

faction of his demand, with the express consent of Arthur, and the presumed consent of Levi, who had relinquished the estate to Arthur. Arthur, by his contract with Levi, had bound himself to pay the debts of the estate, and the estate was bound for them. Bryant accepted the conveyance of it to his grandchildren, in the belief that the estate had been applied just as the law would have applied it if it had been enforced through the courts, and he paid a large sum to discharge the most valuable portion of the estate from a paramount claim upon it. All this was known to Levi. He knew that Bryant reposed in security in the belief that he had obtained the land for his judgments, and the sum he was to pay to discharge the purchase-money of the 16th section. Yet he kept silent, and Bryant justly supposed that he acquiesced in what had been done. It is not allowable that Levi, by his silence and lapse of time, should acquire the estate, which was subject to Bryant's judgments, discharged of them. Good faith required, when he saw that Bryant was deceived, that he should undeceive him. If he was dissatisfied, and intended to dissent from the arrangement Arthur had made, he should have spoken then, or forever afterwards have remained silent. He failed to warn Bryant, who, after waiting more than a year, and hearing no murmur of dissatisfaction, discharged a debt of more than $3,000, which Arthur had stipulated he should pay on the 16th section, and afterwards, for years, paid taxes on the land, and occupied and cultivated it, until the hostile assertion of title by Levi, who now claims the land, discharged from all leins by lapse of time. There was culpable silence on the part of Levi. Bryant was led by his conduct to suppose that he had abandoned all claim to the estate. Bryant refrained from executing his judgments, and made a conventional arrangement with Arthur, of which Levi afterwards had full knowledge, and made no complaint to Bryant until Bryant had changed his position, and could not forsake his course without injury.

Levi cannot now be allowed to change his attitude towards Bryant and the estate. If Bryant, trusting to the acquiesence

of Levi in the arrangement made with Arthur, has, by lapse of
time, lost the right to execute his judgments, he has acquired
the right in a court of chancery to preclude Levi Staton from
disturbing the transaction in which he so long acquiesced, ex-
cept upon the condition of preserving the *statu quo*. Bryant,
having a valid charge upon the land, was let into its enjoy-
ment as owner, and afterwards discharged part of the land
from an incumbrance which was recognized by the executor,
Arthur Staton, to be a valid one ; and all this was known to
Levi, who made no objection under circumstances well calcu-
lated to evoke its expression, if he had any, and for years
acquiesced in it by his silence, and, meanwhile, received to
his own use some personal property of the estate of Harvey
Staton, which was liable to Bryant's judgments before they
were satisfied by conveyance of the land, and was withdrawn
from liability only by reason of such satisfaction.

If, after all this, Levi asserts his legal right to the land, it
must be with the same result which would have attended its
assertion at the outset. Lapse of time makes no difference,
because it was permitted to elapse with his consent, as justly
implied from his silence, after knowledge of the transaction.
The interest of Levi in the estate was what might be left after
its liabilities were all discharged. The judgments of Bryant
bound it, and the purchase-money of the 16th section was
recognized by Arthur, the executor, as a valid charge, and the
note of Bryant for that was not given until more than a year
after Bryant's purchase of the land, one of the conditions of
which purchase was that this demand should be paid by
Bryant. As Levi made no objection then, he cannot now
object that the 16th section was not liable for the purchase-
money because of the bar of the statute of limitations.

When Bryant bought the land, the legal title was in Levi
Staton, one half-interest by devise, and the other half by the
deed from Arthur ; but both were subject to the paramount
rights of creditors, and Levi could hold the land only subject
to these paramount rights. Bryant knew that Levi had

derived a one-half interest in the land under the will of Harvey Staton. He did not know as a fact that Arthur had conveyed to Levi, but the deed of Arthur to him was on record, and he had constructive notice of it. He is, therefore, in the attitude of one who deals knowing the condition of the legal title, and as to that he cannot claim an estoppel against Levi by silence. Equity will not, on the mere ground of silence, relieve one who is perfectly acquainted with his rights, or has the means of becoming so, and yet willfully acts as owner without obtaining the consent of the owner. A party should ordinarily inquire into the title before he undertakes to appropriate property. He whose title is on record has given the notice which all are bound to know and respect. The law does not require more, generally, but the owner must act or speak, if at all, consistently with his recorded title. He must not do or say anything to mislead. There is a wide difference between encouragement and silence. It is only when silence becomes a fraud that it operates as an estoppel. So varied are the relations and transactions of men, that equity, which has ever refused to attempt any precise definition of fraud, lest knavish ingenuity should evade it, has done no more in reference to estoppel by conduct than to announce the general principles by which it will be guided in applying it — leaving each case in which it may be invoked to be determined by its own peculiar circumstances. The doctrine springs from the determination to prevent fraud, resulting in injustice. It has had active growth in modern times, and is being gradually extended in its sphere of usefulness to prevent wrong.

We have stated some of the principles sanctioned by the authorities. See Bigelow and Herman on Estop., *passim;* *Crest* v. *Jack*, 3 Watts, 238; *Knouff* v. *Thompson*, 16 Pa. St. 357; *Hill* et al. v. *Epley* et al., 31 Pa. St. 331; *Brant* v. *Virginia Coal Co.*, 9 U. S.

Guided by them, we must hold that Bryant and his co-complainants cannot, as to the legal title of Levi Staton, claim an estoppel. Bryant knew of that, and cannot build an estoppel

upon his own default-to obtain a conveyance from Levi.  Bryant was not deceived and misled as to the legal title.  If he claims under the contract between Arthur and Levi in 1865, he must take subject to it, and the land would be bound, for $1,000, to Levi for unpaid purchase-money.  But his claim is paramount to that.  *Sulphine* v. *Dunbar* et al. *ante*, 255.  But Bryant can justly claim that Levi shall not gain by lapse of time a greater interest in the estate than he had before ; that, as he knew that Bryant refrained from active legal measures to enforce his judgments, upon a conventional arrangement expressly made with Arthur, and afterwards expended a large sum to pay a debt of Harvey Staton, all with the full knowledge and presumed consent of Levi, Bryant shall be saved harmless, and be allowed to enforce his claims against the estate — a course made necessary now by the active assertion of his legal title by Levi, after his long silence and acquiescence. Bryant should lose nothing, and Levi should gain nothing, by his course. . Levi virtually assented to Bryant's course, and he cannot now dissent to Bryant's prejudice.  To permit him to gain an advantage over Bryant would be to sanction manifest wrong.

The decree will be reversed and cause remanded for an account to be taken of the amount due on the judgments of Bryant, computing interest to date, and the amount of the claim in favor of the township trustees of the 16th section, discharged by Bryant, with interest on it at the rate the note was bearing, and the taxes paid by Bryant or his grandchildren on the land, and of the value of the improvements made upon the land by Bryant or his co-complainants, and of the value of the rents, and for a final decree in accordance with this opinion and the principles of equity.  But in taking the account of the rents, they should not be estimated as in case of an annual leasing to different persons in quantities to suit them, with all the trouble and hazards of such leasing ; but the plantation should be considered as a whole, and leased for a term of years, from January, 1868, to the autumn of 1873, upon undoubted

security for payment of rent, and without the trouble and risk
of proprietorship, and Bryant should be charged rent on this
principle. After 1873 (the suit of Levi being brought in Sep-
tember of that year) the rent should be of the plantation as
a whole, from year to year. The purpose of the accounting
should be, as nearly as practicable, to prevent Bryant from
losing, and Staton from gaining, by reason of the transaction
between Bryant and Arthur about the land.

CHALMERS, J., specially concurring.

The relief prayed in the bill was in the alternative either
that the appellant might be enjoined from asserting his legal
title, or that the appellees might be allowed to vacate the sat-
isfaction of the judgment and subject the land to its payment
and to the amount paid to the trustees of the school fund. I
think the facts warranted the granting of either form of relief.

NOTE. — The following is a part of the decree of this court which it is thought
embraces a new and important principle :

"It is further ordered that, in taking the account for rents, the commissioner
shall ascertain by proof the fair value of a lease of said lands, from the 1st day of
January, A. D. 1868, to the 1st day of January, A. D. 1874, as if they were leased
for the whole term, in one contract, to a responsible tenant, with undoubted secu-
rity, who would pay the rent promptly at the end of each year, without a resort to
legal proceedings, or the use of any other means to secure payment than a readiness
by the appellees to receive the money, and with the obligation on the part of said
tenant to keep the premises in such good repair as is necessary for the convenient
use and occupation of the same. That, in making such estimate of rent, he shall
adopt and report such sum as the said land would readily have brought without
any further effort on the part of the lessor to secure a tenant than giving notice in
the neighborhood that the said land was for lease. Said commissioner, for the year
1874, and all subsequent years up to the 1st day of January of the year succeeding
the making of his report, shall ascertain and report the value of said rent on a
yearly leasing of the same, but to be governed in all other respects, in ascertaining
the rent, according to the principles hereinbefore mentioned and stated in the
opinion. The said commissioner shall also ascertain and report the value of all
permanent and valuable improvements made by the appellees, or any of them, as
they exist at the date of stating the account. And the same shall then be credited
by said appellees in taking said account, but the rent shall not be increased at any
time on account of the same."