# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00199-SCT

*HARROLD COTHERN*

*v.*

*VICKERS, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/1998 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES L. MARTIN |
| ATTORNEYS FOR APPELLEE: | DOUGLAS E. LEVANWAY |
| | CHAD MICHAEL KNIGHT |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 05/25/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/15/2000 |

**BEFORE BANKS, P.J., WALLER AND DIAZ, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. On September 11, 1997, Harrold Cothern filed a complaint against Vickers, Inc.,[1] in the Circuit Court of the First Judicial District of Hinds County, Mississippi, seeking compensatory and punitive damages for (1) breach of an employment contract; (2) wrongful demotion and discharge; (3) breach of the covenant of good faith and fair dealing; (4) intentional infliction of mental distress; and (5) outrage. On October 8, 1998, the circuit court granted Vickers's motion for summary judgment. Feeling aggrieved, Cothern appealed, assigning three points for review:

> **I. WAS THE EVIDENCE SUFFICIENT TO SHOW, AS A MATTER OF LAW, THAT VICKERS, INC., DID NOT BREACH A CONTRACT OF EMPLOYMENT OR, IN THE ALTERNATIVE, THAT IT DID NOT WRONGFULLY DISCHARGE COTHERN?**

> **II. WAS THE EVIDENCE SUFFICIENT TO SHOW, AS A MATTER OF LAW, THAT COTHERN WAS NOT ENTITLED TO EQUITABLE RELIEF?**

## III. WHETHER GENUINE ISSUES OF MATERIAL FACT EXISTS WHICH PRECLUDE THE GRANT OF VICKERS' MOTION FOR SUMMARY JUDGMENT?

Because Cothern has failed to produce evidence sufficient to generate a genuine issue of material fact on the essential elements of his claims, we affirm the circuit court's summary judgment in favor of Vickers.

## STATEMENT OF FACTS

¶2. On or about May 10, 1965, Cothern began his employment with Vickers as an hourly production and maintenance employee. As an hourly employee, Cothern's employment relationship with Vickers was subject to a collective bargaining agreement between Vickers and the labor union of which Cothern was a member. On August 10, 1968, Cothern was promoted to a salaried, supervisory position, resulting in an employment relationship no longer covered by the labor agreement. Cothern remained with Vickers in various salaried, managerial positions, receiving several promotions and pay raises until he resigned his employment effective April 28, 1997. At no time during Cothern's employment as a salaried employee was he a party to a written contract of employment with Vickers.

¶3. On or about February 28, 1997, Ike Rookmaker, a line supervisor, advised Cothern that there currently were two employees clocked in on the second shift who were not doing anything since work from another department had not been released and who had failed to perform alternative work assigned to them. Cothern and Rookmaker discussed these two individuals with union representatives. Thereafter, Cothern, acting in his supervisory role as Superintendent of the Second Shift, sent the two hourly wage employees home on a temporary layoff. Vickers's senior management reviewed this action and determined, although not unanimously, that sending the employees home was in violation of the labor agreement to which the hourly employees were parties. Specifically, Cothern was told that he had violated the labor agreement by not giving the employees 48 hours notice before placing them on temporary layoff. He was also informed, on March 6, 1997, that he was being demoted to the position of Supervisor A of the first shift effective March 17, 1997. He would receive no reduction in pay, but his salary would be capped until the pay structure for the demoted position increased to a level equal to the pay for the position Cothern was in prior to his demotion.

¶4. After leaving the Vickers plant on March 6, 1997, Cothern sought treatment from a clinical psychologist who diagnosed him as having certain physiological and emotional ailments and advised him that it would be detrimental to his health for him to return to work in the position to which he was demoted. Vickers contacted Cothern by letter informing him that he was expected to return to work and that his failure to do so by April 28, 1997, would be considered as a resignation of his employment. Cothern did not return to Vickers.

## STANDARD OF REVIEW

¶5. The circuit court's grant of summary judgment is reviewed by this Court de novo. ***Hernandez v. Vickery Chevrolet-Oldsmobile Co.,*** 652 So. 2d 179, 181 (Miss. 1995). This Court's review is governed by the same standard used by the circuit court under Rule 56(c) of the Mississippi Rules of Civil Procedure. ***Brown v. Credit Ctr., Inc.***, 444 So. 2d 358, 362 (Miss. 1983). The trial court must review carefully all of the evidentiary matters before it: admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion is made. ***Id.*** If there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of

law, summary judgment should be granted in the moving party's favor. *Id.*

¶6. The burden of demonstrating that no genuine issue of material fact exists is on the moving party. *Id.* To defeat a motion for summary judgment, the nonmoving party must make a showing sufficient to establish the existence of the elements essential to his case. *Id.* In other words, the nonmovant must present affirmative evidence that a genuine issue of material fact exists. As to issues on which the nonmovant bears the burden of proof at trial, the movant needs only to demonstrate an absence of evidence in the record to support an essential element of the movant's claim. *Crain v. Cleveland Lodge 1532, Order of Moose, Inc.*, 641 So. 2d 1186, 1188 (Miss. 1994). The nonmovant then bears the burden by affidavit or otherwise of setting forth "specific facts showing that there are indeed genuine issues for trial." *Fruchter v. Lynch Oil Co.*, 522 So. 2d 195, 199 (Miss. 1988). The nonmovant should be given the benefit of every reasonable doubt. *Rosen v. Gulf Shores, Inc.*, 610 So. 2d 366, 368 (Miss. 1992).

## DISCUSSION OF LAW

### I. WAS THE EVIDENCE SUFFICIENT TO SHOW, AS A MATTER OF LAW, THAT VICKERS, INC., DID NOT BREACH A CONTRACT OF EMPLOYMENT OR, IN THE ALTERNATIVE, THAT IT DID NOT WRONGFULLY DISCHARGE COTHERN?

### II. WAS THE EVIDENCE SUFFICIENT TO SHOW, AS A MATTER OF LAW, THAT COTHERN WAS NOT ENTITLED TO EQUITABLE RELIEF?

### Constructive Discharge

¶7. Cothern asserts that he was both wrongfully demoted and constructively discharged by Vickers. Cothern bases his claim of constructive discharge on the fact that he was demoted. Specifically, Cothern contends that Vickers should have known that demoting a person with 30 years of dedicated service to the company for sending home two hourly wage employees under questionable circumstances would have caused the employee "unbearable stress and humiliation" and that a reasonable employee would have felt compelled to resign given the demotion. Cothern supports this claim by pointing to emotional and physiological ailments he suffered following the demotion and his psychologist's recommendation not to return to work under this adverse employment environment. While Cothern's demotion was unfortunate and its impact on Cothern apparently significant, his demotion alone cannot support a claim for constructive discharge. Mississippi law defines "constructive discharge" as follows:

> "[A] constructive discharge may be deemed to have resulted when the employer made conditions so intolerable that the employee reasonably felt compelled to resign." *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983). Would a reasonable person in the employee's shoes have felt compelled to resign? *Shawgo*, 701 F.2d at 481 n.12 (citing *Pittman v. Hattiesburg Municipal Separate School Dist.*, 644 F.2d 1071, 1077 (5th Cir. 1981)). We do not delve into the employer's state of mind or purpose; but rather the focus is on whether or not the employer made conditions intolerable. *Shawgo*, 701 F.2d at 481 n.12 (citing *Borque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5th Cir. 1980)). Additionally, the Fifth Circuit seeks to determine whether or not the employee could reasonably conclude that he had no meaningful choice but to resign. *Junior v. Texaco Inc.*, 688 F.2d 377, 380 (5th Cir. 1982).

*Bulloch v. City of Pascagoula*, 574 So. 2d 637, 640 (Miss. 1990); *see also [Hoerner Boxes, Inc. v.](#)*

*Mississippi Employment Sec. Comm'n*, 693 So. 2d 1343, 1346 (Miss. 1997). Several other jurisdictions have found that a demotion alone is insufficient to support a claim for constructive discharge. The United States District Court for the Central District of California has stated:

> Demotion of a job level, even when accompanied by reduction in pay, cannot constitute ipso facto constructive discharge under California law. *See **Borque v. Powell Elect. Mfg. Co.**, 617 F.2d 61, 66 (5th Cir. 1980) (followed by the Ninth Circuit in **Nolan**); see also **Alicea Rosado v. Garcia Santiago**, 562 F.2d 114, 119 (1st Cir. 1977).*

**Wagner v. Sanders Assocs., Inc.**, 638 F. Supp 742, 745 (C.D. Cal. 1986). *See also **Fischhaber v. General Motors Corp.,*** 174 Mich. App. 450, 454, 436 N.W.2d 386, 388 (1987) (employer was not liable on wrongful discharge claim of employee who retired after being given choice of demotion from salaried position to hourly position or dismissal on constructive discharge, where employee retired without inquiring into what his hourly work assignment would be).

¶8. Cothern argues that the particular circumstances of his demotion created intolerable conditions. Insufferable as the demotion may have been to Cothern personally, a review of the record reveals an absence of harassment, coercion, threats, or other employer conduct which makes working conditions intolerable. Cothern was privately told of his demotion and its effective date, then offered the opportunity to take the rest of the day off. The position awaiting Cothern on his return was still a high-level supervisory position at the same rate of pay he received before the demotion. Cothern took the rest of the day off and never returned. Thus, as Vickers argues, there was never an opportunity for Cothern to be subjected to any "intolerable" working conditions which would warrant a finding of constructive discharge. *See **Wagner**,* 638 F. Supp. at 745.

¶9. Because Cothern pointed to no intolerable act by Vickers and demotion alone does not constitute a constructive discharge, Cothern cannot support a claim for constructive discharge. Therefore, this Court's determination must be limited to whether or not his demotion is actionable.

## Breach of Employment Contract

¶10. Cothern claims to be a party to an employment agreement with Vickers wherein he possesses rights greater than an employee-at-will. He argues that a contract for permanent employment was created through the oral representations of his supervisor, Jim Porch. Cothern asserts that in 1968, Porch, then a member of Vickers's management staff, represented to him that if he gave up his hourly wage position to accept a managerial, salaried position, he would have lifetime employment at Vickers, terminable only for good cause. It is this representation upon which Cothern bases his argument that an enforceable contract for employment was formed. In his affidavit, Cothern recalled his conversation with Porch:

> On August 7, 1968, I was offered a managerial position at the Jackson plant by Jim Porch who at that time was Production Superintendent. Mr. Porch represented to me if I would accept the salaried position of machining foreman I would have a job at the Jackson Plant forever as long as there was work to do and I did my work satisfactorily, and my job would only be interrupted or terminated for good cause. I was reluctant to give up protection of a union employee because at that time I had super-seniority as shop steward. I initially rejected Mr. Porch's offer and then six months later because of his continued representations I accepted Vickers' offer and became a salaried employee thereby giving up the protections afforded by the collective bargaining agreement.

¶11. Assuming that Cothern was employed under an enforceable contract specifying that his job at Vickers could be "interrupted or terminated" only upon good cause, Cothern nonetheless fails to create a genuine issue of material fact as to whether the contract was breached. Cothern never made any contention in his discovery responses, his affidavit or his deposition that he was promised anything more than "employment" with Vickers. There is no evidence in the record that Cothern was promised that he would become and remain Superintendent of the Second Shift or that he could never be demoted. Thus, Cothern is entitled to nothing beyond the original transaction: having permanent employment at Vickers. At best, Cothern could possibly claim entitlement to a managerial position. However, Cothern has presented no facts to support a claim of entitlement to the specific, advanced position he had attained prior to his demotion. The record reveals that Vickers did nothing to mandate Cothern's absence from his job and thus Cothern's employment was neither terminated nor interrupted by Vickers. Instead, Cothern voluntarily resigned his position.

¶12. In another attempt to create a genuine issue of material fact as to whether his employment contract was breached, Cothern argues that Vickers's customs, policies, and practices created a contractual obligation, requiring Vickers to give notice to supervisory employees of deficiencies in their work performance, counsel them, and give them an opportunity to improve prior to taking any disciplinary action. In support of his contention, Cothern submitted affidavits from himself and others stating that such was Vickers's policy. However, Cothern admitted in his deposition that no such written policy existed:

BY MR. LEVANWAY (For Vickers):

Q: I guess my original question was: Does there presently exist a written policy regarding how salaried persons are disciplined. I think you said, "No, there doesn't presently exist a written policy, but you remember there used to be a this general administrative manual."

A: I don't think there is a written policy. The only policy we got is the actions of my supervisor's take with anybody that's falling short of any productive status of their job.

Q: O.K. So your testimony, then, is that there isn't a written policy, but there are practices, ways that people have acted, that you think establishes a policy of some sort; is that correct?

A: That's right.

* * *

Q: When Mr. Porch was telling you about having this conversation with you, did he tell you that any specific procedure would be used if, in fact, you were disciplined in some way?

A: Not that I can remember. The biggest thing that I can remember from anybody that has been my supervisor, is to lead by example . . .

* * *

Q: Now, you've testified about the way you saw other people in supervision dealing with discipline. You know, that there was-you think-a practice there that was sort of handed down. Are you talking-is there anything else that you are referring to by way of policies Vickers promulgated, other than that? Other than what we were just talking about?

A: There was no written policy. The only policy is by the actions and reactions that has taken place by my superior, Human Resources, in the way you deal with particular measures at hand.

¶13. This Court has held that contractual obligations may arise from, and an employment contract may be modified by, a personnel or pension manual or other representations. *See **Bobbitt v. Orchard, Ltd.**,* 603 So. 2d 356 (Miss. 1992). In ***Bobbitt***, however, it was a *written* policy or manual which created or modified the contractual obligations. Were Cothern able to produce evidence sufficient to create a genuine issue of material fact as to whether some written policy existed which gave him a right to be counseled and an opportunity to correct his deficiencies before disciplinary action could be taken, summary judgment would have been inappropriate under the precedents of this Court. However, Cothern admitted that he can identify no such written policy.

¶14. Viewing the evidence in the light most favorable to Cothern, he has failed to create a genuine issue of material fact as to whether his employment contract-assuming that one exists-was breached.

### Implied Covenant of Good Faith and Fair Dealing

¶15. Cothern asserts that Vickers has breached the implied covenant of good faith and fair dealing. Cothern bases his assertion on his claim that he was led to believe that (1) by observing the conduct of his superiors, it was incumbent upon him to always keep hourly employees working productively while on the company clock and to send them home if they were shirking their duties or there was no work for them to do, and (2) if he committed an infraction he would be counseled and given an opportunity to improve before any disciplinary action would be taken. Cothern asserts that the 48 hours notice rule that he was alleged to have breached had never been applied to a temporary layoff situation, other members of senior management had sent employees home before for disciplinary problems without giving the employees the benefit of a notice, and those managers suffered no repercussions. Cothern produced affidavits of two other salaried employees in support of what he claims to be the policy of Vickers. Cothern argues that his demotion without notice for sending the employees home-which he claims to have done in the best interest of the company-injures the notion of fundamental justice.

¶16. This Court has held that there is no implied duty of good faith and fair dealing in employment contracts. *See **Hartle v. Packard Elec.**,* 626 So. 2d 106, 110 (Miss. 1993); ***Perry v. Sears, Roebuck & Co.**,* 508 So. 2d 1086, 1089 (Miss. 1987). However, a number of states, although a minority, have recognized such an approach in an attempt to balance the business interests of the employer with the interest of the employee in maintaining his employment. *See, e.g., **Fortune v. National Cash Register Co.**,* 373 Mass. 96, 364 N.E.2d 1251 (1977).

¶17. Even if this Court were to adopt such a rule, Cothern would not prevail under it. The implied covenant of good faith and fair dealing holds that neither party will do anything which injures the right of the other to receive the benefits of the agreement. The implied covenant operates only where there is already an existing contract. Cothern argues that Vickers violated the covenant by not adhering to its own practices in dealing with him. However, as stated above, a contractual obligation could not have arisen from these unwritten practices. *See **Bobbitt***, 603 So. 2d at 301. With no existing contractual obligation, there can be no implied covenant. Assuming that Porch's representations and Cothern's acceptance of such created an employment contract for lifetime employment, Cothern has still failed to create a genuine issue of material fact as to whether the implied covenant was breached. Cothern does not contend that he was promised anything but permanent employment. There is no evidence in the record that he was ever promised that he could not be

demoted. Even with the demotion, Cothern was still receiving the benefit of his bargain: permanent employment. Cothern could have conceivably remained on the job for the remainder of his life. Instead, he voluntarily resigned; and therefore, summary judgment on his claims for breach of the implied covenant of good faith and fair dealing was appropriate.

## Equitable Estoppel

¶18. For the same reasons that he makes a claim for a breach of the implied duty of good faith and fair dealing, Cothern also makes a claim for relief under the application of equitable estoppel. Cothern argues that Vickers should not be allowed to "instruct and encourage a certain method of performance by its supervisors and then without warning discipline Cothern for doing exactly what he had been taught to do for many years."

¶19. A party asserting equitable estoppel must show (1) belief and reliance on some representation; (2) change of position as a result thereof; and (3) detriment or prejudice caused by the change of position. *Covington County v. Page*, 456 So. 2d 739, 741 (Miss. 1984); *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 206 (Miss. 1984); *Resolute Ins. Co. v. State*, 290 So. 2d 599, 602 (Miss. 1974).

¶20. Equitable estoppel has its roots in the "morals and ethics of our society." *PMZ Oil Co.,* 449 So. 2d at 206. "Fundamental notions of justice and fair dealings provide its undergirding." *Id.*

¶21. This Court's holdings on equitable estoppel have suggested a difference in treatment between cases where there is fraudulent intent and cases where such intent is absent. This Court's case law intimates that where there is no fraudulent intent at the outset, there must be substantial detriment to support a claim for equitable relief.

> [A]n equitable estoppel may be enforced in those cases in which it would be substantially unfair to allow a party to deny what he has previously induced another to believe and take action on. Our early case of *Staton v. Bryant*, 55 Miss. 261, 273 (1877) suggests that one such as PMZ may not "change his attitude" to the substantial detriment of another and avoid an estoppel on grounds that at the outset his heart was pure. It is sufficient if the acts of the party sought to be estopped, although made without subjective intent to mislead, were, objectively speaking, calculated to mislead, and did mislead.
>
> Fraudulent intent to mislead or deceive where present may often, when relied upon, produce inequity and hence an estoppel. This does not mean that no estoppel may be enforced absent such intent *ab initio*. For there are cases, of which this is one, where there has resulted substantial inequity produced by a change of attitude *sans* original subjective fraudulent intent. Substantial inequity is our touchstone. *Izard v. Mikell*, 173 Miss. 770, 774, 163 So. 498, 499 (1935).

*PMZ Oil Co.*, 449 So. 2d at 207.

¶22. A close review of the record reveals that Cothern has not claimed that Vickers had in mind a fraudulent intent or scheme at the time it allegedly induced Cothern to perform in a certain manner and then, without warning, disciplined Cothern for taking such action. Indeed, there is an absence of any evidence in the record from which a fraudulent scheme may be inferred. Therefore, it was incumbent upon Cothern to create a genuine issue of material fact as to whether he suffered a *substantial* detriment. Cothern was demoted to a position that was still within high-level management. He suffered no reduction in pay -- only a

temporary cap. Therefore, we conclude that no reasonable juror could find a substantial detriment. Cothern having failed to create a genuine issue of material fact on this essential element, the trial court's grant of summary judgment on Cothern's equitable relief claim was appropriate.

### Intentional Infliction of Mental Stress or Outrage

¶23. Finding that Vickers was within its rights to demote Cothern and that the record reveals that Vickers committed no accompanying aggravating acts, we conclude as a matter of law from the undisputed evidence that Vickers's actions were not willful, wanton, malicious or intentionally wrong and that Vickers could not reasonably foresee that demonstrative harm might have resulted therefrom. *See Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 742 (Miss. 1999); *Fuselier, Ott & McKee, P.A. v. Moeller,* 507 So. 2d 63, 69 (Miss. 1987). Therefore, the circuit court did not err in granting summary judgment against Cothern on his claims for intentional infliction of mental stress and outrage.

### CONCLUSION

¶24. For the foregoing reasons, the circuit court's grant of summary judgment in favor of Vickers is affirmed.

¶25. **AFFIRMED.**

> **PRATHER, C.J., PITTMAN AND BANKS, P.JJ., McRAE, SMITH, MILLS, COBB AND DIAZ, JJ., CONCUR.**

1. In addition to Vickers, Inc., Cothern named as defendants several of its managerial employees, C. F. Lyke, Donald Polk, Stephen Jones, and T. N. Watson. By order dated April 15, 1998, the individual defendants were dismissed from this action, and their dismissal is not at issue on this appeal.