# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-IA-00184-SCT

*B. C. ROGERS POULTRY, INC. AND
BANK OF MORTON*

**v.**

*TOMMY WEDGEWORTH*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 01/19/2000 |
| TRIAL JUDGE: | HON. ROBERT G. EVANS |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | RONALD C. MORTON |
| | GEORGE R. FAIR |
| | LARRY SPENCER |
| | LYNN P. LADNER RISLEY |
| ATTORNEYS FOR APPELLEE: | JOHN W. CHRISTOPHER |
| | EUGENE COURSEY TULLOS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED AND REMANDED - 09/15/2005 |
| MOTION FOR REHEARING FILED: | 07/07/2005 |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is denied.  This Court's previous opinions are withdrawn, and these opinions are substituted therefor.

¶2.     Tommy Wedgeworth sued B.C. Rogers Poultry, Inc. ("Rogers") and the Bank of Morton ("Bank") in the Circuit Court of Smith County, Mississippi.  The Bank filed its answer with a multicount counterclaim against Wedgeworth.   Rogers pled the affirmative defense of

arbitration in its answer. Subsequently, Rogers filed a motion to stay claim and compel arbitration on March 5, 1999. On April 27, 1999, the Bank filed a Motion to Dismiss and joined Rogers's motion to compel arbitration. The circuit court denied the motion to compel arbitration, and we granted Rogers and the Bank permission to bring this interlocutory appeal, see M.R.A.P. 5. Before briefing was complete on this appeal, Rogers filed for bankruptcy. The bankruptcy proceeding has concluded, and all claims against Rogers have been discharged. Therefore, the issue before this Court is whether the trial court erred in denying the Bank's motion to compel arbitration. We affirm the trial court's denial of the motion to compel arbitration.

## FACTS

¶3. Wedgeworth was a contract poultry grower for Rogers. Since the 1960's, the Wedgeworth family had contracted with Rogers to grow chickens owned and ultimately processed by Rogers, for a fee. Rogers and Wedgeworth had entered into numerous Broiler Growing Agreements which designated what each parties' obligations were with respect to the growing and processing of the chickens. The Broiler Growing Agreements generally provided that Rogers would supply chickens, feed, and advice to Wedgeworth, and Wedgeworth would provide housing and labor to care for Rogers's chickens. Wedgeworth would then be paid by Rogers based upon the efficiency at which the flock of birds converted pounds of feed to pounds of meat. The contract under which the Bank seeks to compel arbitration was between Wedgeworth and Rogers and was executed on February 5, 1997. It was for a stated term of three years and contained this arbitration clause:

ARBITRATION

2

ALL DISPUTES OR CONTROVERSIES ARISING UNDER THIS AGREEMENT, INCLUDING TERMINATION THEREOF, SHALL BE DETERMINED BY A THREE MEMBER ARBITRATION PANEL (THE "PANEL") SELECTED BY THE PARTIES TO THIS AGREEMENT, IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT, AND SUCH DISPUTE OR CONTROVERSY SHALL BE JUDGED PURUSANT TO THE RULES AND PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION (AAA), AND THE FINDINGS OF SUCH PANEL SHALL BE FINAL AND BINDING ON ALL THE PARTIES TO THIS AGREEMENT. Each party to any dispute hereunder shall appoint an arbitrator, qualified by the AAA, to serve on the panel, with the third panel member to be selected by the two appointed members. Each party shall pay the fees, costs, and expenses associated with the arbitrator selected by that party, and the fees, costs, and expenses associated with the third arbitrator shall be shared equally by both parties, as accrued. In the event of a final adjudication by the panel, all fees, costs, and expenses incurred by the successful party as a result of the dispute, including attorneys fees and arbitrator fees, shallbe bourn by the unsuccessful party.

The parties agree and recognize that the business of raising, processing, and producing poultry products is extensively involved in interstate commerce, and that various loans and extensions of credit made to GROWER and COMPANY are directly related thereto. The parties stipulate that the Federal Arbitration Act is applicable to the agreement. THE PARTIES STIPULATE THAT THE PROVISIONS OF THIS ARBITRATION CLAUSE SHALL BE A COMPLETE DEFENSE TO ANY SUIT, ACTION, OR PROCEEDING INSTITUTED IN ANY FEDERAL, STATE, OR LOCAL COURT OR BEFORE ANY ADMINISTRATIVE TRIBUNAL WITH RESPECT TO ANY CONTROVERSY OR DISPUTE ARISING DURING THE PERIOD OF THIS AGREEMENT AND WHICH IS ARBITRABLE AS SET FORTH IN THIS AGREEMENT. The arbitration provisions of this agreement shall, with respect to such controversy or dispute, survive the termination or expiration of this agreement.

None of the previous contracts between Wedgeworth and Rogers contained an arbitration clause. Further, this clause did not state that it was applicable to disputes which existed before its execution.

¶4. Preceding and following the execution of the Broiler Growing Agreement, the Bank and Wedgeworth entered into a series of other contracts, none of which contained an arbitration

clause.[1]  There was no evidence presented that any of the Bank/Wedgeworth contracts were simultaneously executed or were part of a global transaction.

¶5.    On December 1, 1998, Wedgeworth filed a suit in the Circuit Court of Smith County, Mississippi.  Wedgeworth asserts that beginning in 1982, Rogers and the Bank forced and coerced him to assign collateral and/or borrow money on Rogers's behalf.  Furthermore, Wedgeworth alleged that the defendants violated the provisions of Miss. Code Ann. § 75-21-1 in their formation of trusts and combines in restraint and hindrance of trade.  Wedgeworth also alleges that in 1995-1996, Rogers interfered with a sale of Wedgeworth's farm in retaliation for the grower legislation lobbying efforts of Wedgeworth's sister.  Wedgeworth further alleges that in April of 1996, Rogers forced and coerced him to make upgrades to his farm and equipment which was also in retaliation for the lobbying efforts of his sister.

**ANALYSIS**

¶6.    The Bank asserts that the trial court erred in denying the motion to compel arbitration because the dispute arises out of the contract which contains the arbitration clause. Wedgeworth alleges that his claims against the Bank originated before the contract and therefore are outside the scope of the contract containing the arbitration clause.

¶7.    We review de novo the grant or denial of a petition to compel arbitration.  ***East Ford, Inc. v. Taylor***, 826 So. 2d 709, 713 (Miss. 2002).

    **I.**    **Did the circuit court err in denying the Bank's motion to compel arbitration?**

---

[1]The Bank and Wedgeworth entered into a series of promissory notes dated: March 14, 1995, August 17, 1995, December 21, 1995, January 22, 1997, October 7, 1997, and April 29, 1998.

4

*A. The arbitration clause does not apply retroactively to conduct which occurred prior to the execution of the February 5, 1997 Broiler Growing Agreement.*

¶8.     Our law requires this Court to accept the plain meaning of a contract as the intent of the parties if no ambiguity exists. ***I.P. Timberlands Operating Co. v. Denmiss Corp.***, 726 So. 2d 96, 108 (Miss. 1998). Furthermore, "[c]ontracts are solemn obligations and the Court must give them effect as written." ***Id.*** We agree with the U.S. Supreme Court that, "we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." ***EEOC v. Waffle House, Inc.***, 534 U.S. 279, 294, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002). Here, the language of the Broiler Growing Agreement does not include a single word or phrase which expresses an intent by the parties that the arbitration clause should be applied retroactively to conduct occurring prior to its execution. Au contraire, the plain language states otherwise.

¶9.     The first paragraph of the Broiler Growing Agreement reads as follows: "Effective for broiler flocks placed on GROWER'S farm **on or after 2-5-1997 or after execution of this Agreement** by GROWER and COMPANY whichever occurs later." (emphasis added). The Broiler Growing Agreement was executed by the grower, Wedgeworth, and the company, Rogers, on February 5, 1997. The Bank was neither a party to the contract, nor a signatory to the contract or any other related contract on that date. Furthermore, the plain language of section six clearly reads as follows: "for a term of three years."[2]

---

[2]The contract also would automatically renew for one successive three-year term unless written notice was given.

¶10. The three-year term Broiler Growing Agreement contains no language revealing an intent by the parties to suggest, much less require, retroactive application of the arbitration clause to putative claims which arose prior to the date of the agreement. Of significance is the uncontested fact that during the years proceeding and following the execution of the Broiler Growing Agreement, the Bank and Wedgeworth entered into a series of other contracts, not one of which contained an arbitration clause. This Court remains unconvinced, as the law requires, that Wedgeworth knowingly, intelligently, and voluntarily waived his fundamental right to a jury trial, when all contracts in effect at the time of the alleged tortious conduct, regardless of whether the contracts were between the Bank and Wedgeworth or Rogers and Wedgeworth, failed to contain arbitration clauses. *See D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 184, 92 S. Ct. 775, 31 L. Ed. 2d 124 (1972). The plain text of the contract between Rogers and Wedgeworth, upon which the Bank relies, contains no language evidencing Wedgeworth's intent to waive his fundamental right to a jury trial in a dispute with the Bank or Rogers for prior alleged wrongdoing.

¶11. Wedgeworth alleges that Rogers and/or the Bank tortiously interfered with a proposed sale of Wedgeworth's farm and forced and coerced Wedgeworth to make upgrades to his farm. The events as alleged in the complaint occurred in 1995-1996 when the contractual relationships between Rogers and Wedgeworth, and separately between Wedgeworth and the Bank were governed by contracts that did not have arbitration clauses. The U.S. Supreme Court has stated that, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT&T Techs., Inc. v. Commun. Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). The Supreme

Court has also said that, "§ 4 of the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that '*arbitration proceed in the manner provided for in [the parties'] agreement.*' " ***Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.***, 489 U.S. 468, 474-75, 109 S.Ct. 1248,1253, 103 L. Ed. 2d 488 (1989) (quoting 9 U.S.C. § 4) (emphasis not in statute). Neither the February 5, 1997, agreement, nor the other agreements, provide for the arbitration of events which occurred before the contract sub judice was executed.

¶12.   This appears to be the first time that this Court has considered the retroactive application of an arbitration clause.   Prudence requires this Court to consider the precedents of other jurisdictions before undertaking such an invasive intrusion into the Bill of Rights and the Mississippi Constitution, by denying a party their constitutional right to a jury trial, absent the party voluntarily contracting away that right.

¶13.   The text of the arbitration clause is narrow and limited in scope.   The Fifth Circuit has made a distinction between "narrow" and "broad" arbitration clauses, classifying a clause as narrow when it limits arbitration to claims which "arise under the contract." ***Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.,*** 139 F.3d 1061, 1067 (5th Cir. 1998).   The arbitration clause in the case sub judice is "narrow", in that it requires arbitration of "disputes or controversies ***arising under this agreement*.**" (emphasis added).   This arbitration clause expressly states and is focused only on those disputes arising under the February 5, 1997, Broiler Growing Agreement.   It does not include broader language that might be construed or interpreted to cover earlier disputes between the parties. *See **Sec. Watch, Inc. v. Sentinel Sys.**, **Inc.***, 176 F.3d 369, 374 (6th Cir. 1999) (where the court stated that, "[h]ad the parties intended

to apply the new ADR processes to disputes arising under the previous contracts, we believe they would have done so explicitly."). Furthermore, "to interpret the arbitration clause to apply retroactively would cause Plaintiff to forego [his] vested right to litigate an accrued claim." *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 727 (E.D. Tex. 2001), *aff'd*, 33 Fed. Appx. 705 (5th Cir. 2002).

¶14.    The Sixth Circuit further held in *Security Watch* that an arbitration clause in a 1994 dealer agreement did not cover disputes relating to products shipped under earlier agreements that did not contain arbitration provisions.    176 F.3d 369.    In concluding that previous shipments were not included in the scope of the arbitration provision, the Sixth Circuit concluded that the scope of the arbitration provision did not extend over time.  *Id.* at 372.  The court found that the agreement specifically detailed the term of the agreement to be twelve months, and "[did] not purport to reach disputes related to the pre-1994 agreement[s].  *Id.* at 372.    The same can be said of the Broiler Growing Agreement here.  It specifically provided for the effective dates of the agreement: beginning February 5, 1997 and extending for a term of three years; unless extended; no less, no more.    Had the parties intended otherwise, they could easily have incorporated language to that effect.

¶15.    Furthermore, the text of the arbitration clause reads it is effective, "with respect to any controversy or dispute arising *during the period of this agreement* . . . ." (Emphasis added). The period of this agreement is from February 5, 1997- February 5, 2000, as indicated by the plain unambiguous language of the contract and does not purport to extend to conduct which occurred prior to the execution of this agreement.

8

¶16. In *Coffman*, the district court held that claims arising while earlier agreements were in effect, which did not contain arbitration clauses, were not arbitrable, even though the most recent agreement contained an arbitration provision. In determining this, the court classified the arbitration clause as being narrow in scope. 161 F. Supp. 2d at 725.

¶17. Here, the arbitration provision contained neither language that was broad enough to cover events which predated the contract's execution, nor language which would broaden its application by containing terms such as "applies to all transactions occuring before or after execution" or "all transactions between us" or "all business with us." Where such a clause exists, a legal basis to apply the arbitration clause retroactively may exist. This is not the case here; however, as the arbitration clause referred to "disputes or controversies arising under this agreement," and did not contain language or speak in terms of the parties' "overall business relationship" or "overall business transactions." This narrow clause has a time specific limited scope, i.e., "three years," and event specific limited scope, i.e. "disputes or controversies arising under this agreement." Our law prohibits this Court from rewriting an unambiguous term of statement of intent and broadening an otherwise narrow arbitration clause, to grant nonnegotiated rights to one party, especially when the conduct predated the contract execution.

¶18. The Bank directs this Court to *Beneficial National Bank, U.S.A. v. Payton*, 214 F. Supp. 2d 679 (S.D. Miss. 2001), where the trial judge held that an arbitration provision was broad enough to apply retroactively to events which predated the amendment of the agreement. However, the arbitration provision in *Payton* is dissimilar to the provision presently before this Court and is therefore distinguishable. Furthermore, this Court cannot ignore the language of *Payton* stating that numerous courts have recognized the following:

9

> if [an] arbitration clause contains retroactive time-specific language, e.g., a phrase reading "this agreement applies to all transactions occurring before or after this agreement," then [the court] may apply the arbitration provision to events relating to past events. Or, if the arbitration clause contains language stating that it applies to "all transactions between us" or "all business with us," then [the court] may apply the arbitration clause retroactively.

*Id.* at 688-89 (quoting *Kenworth of Dothan, Inc. v. Bruner-Wells Trucking, Inc.*, 745 So. 2d 271, 275 (Ala. 1999) (internal footnote omitted). No such language is found within the arbitration provision at issue here.

¶19. The dissent seeks refuge in the entire agreement clause to assert that the Broiler Growing Agreement governs disputes which arose while other prior non arbitrable contracts were in effect. The entire agreement clause in the Broiler Growing Agreement contained the following language:

> This Agreement constitutes the entire agreement between the parties hereto, replacing and superseding any and all prior oral or written agreements between the parties, and the same may not be altered, modified, in whole or in part, except in writing. This Agreement and all rights and obligations of the parties hereunder shall be governed under the laws of the State of Mississippi.

This reliance is misplaced, because Wedgeworth has made no claim of breach of any contract, present or prior, between himself, Rogers, and the Bank. Indeed, his complaint does not allege non-performance or breach of any contract involving the Bank, and to succeed in his litigation, Wedgeworth is not required to show a breach of any contract.

¶20. The Sixth Circuit in *Security Watch* considered an entire agreement provision contained in a subsequently executed contract and found that it was inappropriate to read the merger clause as superseding the prior contracts and stated that,

10

> Merger clauses are routinely incorporated in agreements in order to signal to the courts that the parties agree that the contract is to be considered completely integrated. A completely integrated agreement must be interpreted on its face, and thus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document. See 2 FARNSWORTH ON CONTRACTS § 7.3 at 215-25.

176 F.3d at 372.

¶21. Also, the court in *Coffman* found that the purpose of an integration clause is to trigger the parol evidence rule which precludes the enforcement of inconsistent or prior agreements in a finalized contract, and held that,

> In this case, the integration clause prevents provisions or obligations in the 1994 Partnership Agreement, the 1996 Partnership Agreement, or the 1996 Amendment No. 1 from being enforceable in the 1998 Partnership Agreement. However, the integration clause does not necessarily require the conclusion that Plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements fall within the scope of the arbitration clause.

161 F. Supp. 2d at 728.

¶22. Likewise, in the case sub judice, the integration clause prevents provisions or obligations in prior agreements from being enforceable in the February 1997 agreement, but it does not necessarily follow that it requires the conclusion that the plaintiff's claims which arose when other agreements were in effect, whether related or not to the prior broiler growing agreements, fall within the scope of an arbitration clause contained in a subsequently executed contract.

*B.   Scope of Clause does not cover the Dispute between Wedgeworth and the Bank*

¶23. The arbitration clause does not cover events which precede the execution of the contract.  In addition, the scope of the clause does not cover this dispute between Wedgeworth

11

and the Bank. "If the [arbitration] clause is narrow, the matter should not be referred to arbitration or the action stayed, unless the court determines that the dispute falls within the clause." *Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754-55 (5th Cir. 1993). The dispute in this case does not fall within the narrow language of the clause which states that only disputes "arising under" the agreement be arbitrated. The agreement is entitled, "BROILER GROWING AGREEMENT" and sets forth what the company agrees to do and what the grower agrees to do in terms of the broiler flocks that are placed on the grower's farm after a certain date and for a defined term of years. For example, the "COMPANY agrees to [d]eliver a flock of baby chicks for GROWER to manage, care for and raise," and the "GROWER agrees [t]o, properly house, care for, feed and administer medicine to the chickens . . . ." The disputes relating to the alleged tortious conduct did not **arise under** this Broiler Growing Agreement.

¶24. As this Court has stated, "[i]t is possible for the parties in the agreement to limit the scope of the arbitration in any way that is desired." *Horne v. State Bldg. Comm'n*, 222 Miss. 520, 76 So. 2d 356, 359 (1954). The parties to the Broiler Growing Agreement limited the scope of the arbitration clause to: disputes "arising under" the agreement, which governed the Broiler Growing relationship between Rogers and Wedgeworth, and this Court should not rewrite and expand the Broiler Growing Agreement to govern relationships between Wedgeworth and the Bank when the Bank could have required a broad arbitration clause in its business relations with Wedgeworth, had it only chose to do so.

¶25. Wedgeworth's contractual relationship with the Bank was established and memorialized in six separate promissory notes, not one of which contained an arbitration clause. The Bank

12

was engaged in business and contractual relationships with Wedgeworth throughout the time frame of the events complained, and at any time it could have insisted on including arbitration clauses as to "all claims," but it did not.

### C. Equitable Estoppel

¶26.    "Equitable estoppel is an extraordinary remedy and should only be invoked to prevent unconscionable results." *Harrison Enters., Inc. v. Trilogy Commc'ns, Inc*. 818 So. 2d 1088, 1095 (Miss. 2002).    "The doctrine of equitable estoppel should be applied cautiously and only when equity clearly requires it." *Id.* (quoting *Bright v. Michel*, 242 Miss. 738, 137 So. 2d 155, 159 (1962)).

¶27.    The dissent raises the doctrine of equitable estoppel as espoused in *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524 (5th Cir. 2000), which although instructive, this Court is not bound to follow.  *Grigson* discusses two scenarios where a party should be equitably estopped from denying an arbitration clause's applicability to a non-signatory.  First, *Grigson* opines that equitable estoppel will allow a nonsignatory to compel arbitration, "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against a nonsignatory." *Id.* at 527.  This situation is not before us, as Wedgeworth is not relying on the terms of the Broiler Growing Agreement in asserting his claims against the Bank.

¶28.    *Grigson* next states that equitable estoppel will allow a nonsignatory to compel arbitration, "when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory

and one or more of the signatories to the contract." *Id.* The dissent concludes that the Bank may compel arbitration because Wedgeworth "raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." (¶ 48 infra). Therefore, our analysis will focus on the intertwined-claims test.

¶29. In *Grigson* the plaintiff's allegations were "intertwined with, and **dependent upon**, the distribution agreement." *Id.* at 529 (emphasis added). Wedgeworth, however, does not rely upon the Broiler Growing Agreement in asserting his claims. Wedgeworth's claims, as discussed previously, are not even within the scope of the Broiler Growing Agreement.

¶30. Even though the plaintiff's allegations are **not dependent** upon an agreement, state law principles might provide for the arbitration of disputes between a nonsignatory and a signatory to a contract, where there are allegations of substantially interdependent and concerted misconduct. A non-signatory should have standing to compel arbitration where the non-signatory has a close legal relationship, such as, alter ego, parent/subsidiary, or agency relationship, with a signatory to the agreement. *See Terminix Int'l, Inc. v. Rice,* 2004 So. 2d 2823074 (Miss. 2004) quoting *Washington Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004) ("A nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency."). *See also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988); *Interocean Ship. Co. v. Nat'l Ship. & Trading Corp*., 523 F.2d 527, 539 (2d Cir. 1975). However, a third party who is a

non-signatory to a contract should not be able to enforce an arbitration agreement, under the intertwined claims test, where there is no alter ego, parent/subsidiary, agency, or other form of close legal relationship alleged, and where the "intertwined claims" do not depend on the agreement, neither of which are present in this case. See *Peach v. CIM Ins. Corp.*, 816 N.E.2d 534 (Ill. App. Ct. 2004) (where the court held arbitration would not be compelled absent an agency relationship between a signatory and non-signatory).

¶31. Absent allegations of substantially interdependent and concerted misconduct between a non-signatory and a signatory who have a close legal relationship, the Mississippi law of equitable estoppel should first be examined to determine if conditions are present where equity should allow a non-signatory to compel arbitration. Other jurisdictions have declined to adopt the theory in situations similar to *Grigson*. *See Ervin v. Nokia, Inc.*, 812 N.E.2d 534 (Ill. App. Ct. 2004) (where the court declined to adopt the expanded interpretation of equitable estoppel).

¶32. Under Mississippi law, equitable estoppel exists where there is a (1) belief and reliance on some representation; (2) a change of position as a result thereof; and (3) detriment or prejudice caused by the change of position. *Cothern v. Vickers, Inc.,* 759 So. 2d 1241, 1249 (Miss. 2000); *Covington County v. Page*, 456 So. 2d 739, 741 (Miss. 1984).

¶33. We must consider the traditional elements of equitable estoppel, as defined by this Court, before expanding its application to deny litigants their constitutional right to a jury trial. We are bound by our prior rulings which have defined equitable estoppel as follows:

> Equitable estoppel is 'defined generally as the principle by which a party is
> precluded from denying any material fact, induced by his words or conduct upon

15

which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed.'

*Dubard v. Biloxi H.M.A., Inc.*, 778 So.2d 113, 114 (Miss. 2000) (quoting *Koval v. Koval*, 576 So. 2d 134, 137 (Miss. 1991)).

¶34. The record before us fails to satisfy the requirements for the application of equitable estoppel as defined by our courts. It cannot be said that, when Wedgeworth signed the Broiler Growing Agreement with Rogers, the Bank (1) believed and relied on the representation (2) changed its position as a result of the Broiler Growing Agreement and finally that (3) it suffered detriment or prejudice as a result thereof. There is no proof that the Bank relied to its detriment that Wedgeworth would arbitrate any claim he had against the Bank. The absence of reliance is self evident by the Bank's failure to raise arbitration as an affirmative defense in its answer and then confirmed by its choice to litigate in court by invoking the jurisdiction of the court by filing its counterclaim, followed by discovery.

¶35. To expand the doctrine of equitable estoppel would unfairly deny Wedgeworth access to the courts and force him to arbitrate his claims against the Bank, in spite of the fact that the Bank was not a party to the Broiler Growing Agreement that Wedgeworth entered into with Rogers.

¶36. Equity comes to the aid of those who may not or can not protect themselves. *Cole v. State,* 608 So.2d 1313, 1324 (Miss. 1992); *Johnson v. Howell*, 592 So. 2d 998, 1001 (Miss. 1991). The Bank had at least six opportunities to protect itself by inclusion of an arbitration clause in its contracts with Wedgeworth, as a result of its own business relationship with

16

Wedgeworth. It chose to not do so and therefore should not be granted rights under a contract unrelated in scope or time to the events for which Wedgeworth makes claim.

## CONCLUSION

¶37. The arbitration clause of the Broiler Growing Agreement is narrow, limited in scope and contains no language revealing an intent by the parties to require retroactive application to putative claims which arose prior to the date of the agreement. Furthermore, the elements of equitable estoppel have not been satisfied. Finally, Wedgeworth has made no claim of breach of any contract, present or prior, between himself, the Bank, and Rogers. Accordingly, the circuit court's decision to deny the motion to compel is affirmed, and this case is remanded for further proceedings.

¶38. **AFFIRMED AND REMANDED.**

**WALLER, P.J., EASLEY, GRAVES AND DICKINSON, JJ., CONCUR. SMITH, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COBB, P.J., AND CARLSON, J. DIAZ, J., NOT PARTICIPATING.**

**SMITH, CHIEF JUSTICE, DISSENTING:**

¶39. The majority concludes that the language of the agreement does not contain a single word or phrase which expresses an intent by the parties that the arbitration clause should be applied retroactively to conduct occurring prior to its execution. Furthermore, the majority also concludes that the arbitration clause is narrow and does not cover the disputes in issue. The majority also concludes that the Bank acceded to the jurisdiction of the trial court by failing to raise arbitration in either its answer or affirmative defenses and invoked the jurisdiction of the court by filing a counterclaim. These claims do arise under the arbitration

17

provision of the contract, and this Court should adopt the federal approach and conclude that the Bank of Morton, as a non-signatory defendant, can compel arbitration through the theory of equitable estoppel. I cannot agree; and therefore, I must respectfully dissent.

¶40. "In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties dispute is within the scope of the arbitration agreement." *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002). The second prong considers "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Id.* Under the second prong, applicable contract defenses available under state contract law such as fraud, duress, and unconscionability may be asserted to invalidate the arbitration agreement without offending the Federal Arbitration Act. *Id.*

### I.     Scope of Arbitration Agreement.

¶41. The only part at issue here is whether the parties' dispute is within the scope of the arbitration agreement. Wedgeworth argues that the claims asserted in his complaint do not arise under this contract because the facts upon which the causes of action are based arose prior to the contract of February 5, 1997, and arose out of Wedgeworth's relationship with Rogers under preceding contracts which did not contain arbitration clauses. However, the first sentence of the arbitration clause explicitly defines its scope by stating that "all disputes or controversies arising under this agreement" are subject to arbitration. The contract in question governs the relationship between Rogers and Wedgeworth. Wedgeworth alleges that as a result of this relationship, he was required to borrow money from the Bank and loan it to Rogers.

18

Wedgeworth also claims that as a result of, and in retaliation for, his sister's lobbying efforts, Rogers required a prospective purchaser of his farm to commit to substantial capital improvements to the farm as a prerequisite to approval of the sale. He further alleges that **each successive contract became more demanding and required expenditures of substantial sums of money for improving existing facilities or for the building of new facilities.** These claims are related to his alleged wrongful treatment by Rogers and the Bank. Thus, this relationship is governed by the contract.

¶42. Furthermore, the arbitration clause, with regard to the Bank of Morton, states that "various loans and extensions of credit made to GROWER and COMPANY are directly related thereto." Wedgeworth argues that these claims do not arise under the arbitration agreement because they occurred prior to the signing of the contract containing the arbitration clause. The majority states that "the language of the Broiler Growing Agreement does not include a single word or phrase which expresses an intent by the parties that the arbitration clause should be applied retroactively to conduct occurring prior to its execution. However, the contract has a provision which explicitly states that **all previous agreements between the parties are replaced by this February 5, 1997 agreement**. The contract also states:

> This Agreement constitutes the entire agreement between the parties hereto, replacing and superseding any and all prior oral or written agreements between the parties, and the same may not be altered, modified, in whole or in part, except in writing. This Agreement and all rights and obligation of the parties hereunder shall be governed under the laws of the State of Mississippi.

Thus, by continuing the grower relationship and signing the February 1997 contract **Wedgeworth agreed that this contract replaced all other existing contracts between the parties**. It is therefore absolute that any dispute that arose under a prior contract is governed

19

by the arbitration clause of the February 1997 contract. Furthermore, this Court has held that doubts as to the availability of arbitration must be resolved in favor of arbitration. ***IP Timberlands Operating Co. v. Denmiss Corp.***, 726 So. 2d 96, 107 (Miss. 1998) (citing ***Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.***, 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)). "[U]nless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue, then a stay pending arbitration should be granted." ***Id.*** (citing ***Wick v. Atlantic Marine, Inc.***, 605 F.2d 166, 168 (5th Cir. 1979)).

## II.      Contract Equitable Estoppel

¶43.    The majority holds that Wedgeworth "does not allege non-performance or breach of any contract and to succeed in his litigation, Wedgeworth is not required to show a breach of <u>any</u> contract." (emphasis added.)   I fail to see how Wedgeworth can be successful and prove damages without relying upon the various growers contracts from 1982 forward.   The door is now effectively closed on the route.   Should Wedgeworth attempt to rely upon and /or introduce the contracts he is prohibited therefrom.

¶44.    In concluding that the arbitration clause does not apply retroactively to disputes arising before execution of the present agreement, the majority relies on Sixth Circuit cases. Although those cases are instructive, this court is not bound to follow the Sixth Circuit.

¶45.    This Court should apply the theory of equitable estoppel and hold that the Bank of Morton, as a non-signatory defendant, can compel arbitration.   The Fifth Circuit and the Mississippi federal district courts have both recognized that in certain situations a non-signatory to a contract containing an arbitration provision may compel arbitration against a

20

signatory to the contract on the theory of equitable estoppel. *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000); *Primerica Fin. Servs., Inc. v. Coley*, 192 F. Supp. 2d 655, 657 (N.D. Miss. 2002). According to those courts, there are two situations in which a non-signatory to a contract can compel arbitration against a signatory: (1) when the signatory "raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract;" or (2) when the signatory "must rely on the terms of the written agreement in asserting its claims against the non-signatory." *Id.* This Court should follow our own federal district courts and Fifth Circuit court opinions for guidance here, rather than relying upon Sixth Circuit views.

¶46. The issue to ultimately be determined here is of first impression. This Court has not directly discussed the issue of whether or not a non-signatory to a contract can compel arbitration against a signatory through the theory of equitable estoppel. However, the reasoning of the Mississippi federal courts are persuasive, and this Court should follow their reasoning.

¶47. Here, Wedgeworth "raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Id.* In the complaint, Wedgeworth files suit against Rogers, a signatory to the contract, and the Bank, a non-signatory to the contract. Wedgeworth alleges that the defendants forced him to borrow money from the Bank and turn that money over to Rogers. Wedgeworth alleges that the defendants, jointly and severally, violated the provisions of Miss. Code Ann.§ 75-21-1 in its formation of trusts and combines in restraint and hindrance of trade. That statute specifically prohibits concerted action or joint misconduct. Therefore that allegation

21

necessarily requires concerted misconduct by both Rogers and the Bank. Wedgeworth further alleges that as a part of the loan demanded by Rogers, he was also required to give an assignment to the Bank.

¶48. Wedgeworth's claims raise allegations of substantially interdependent and concerted misconduct by both the non-signatory defendant and the signatory defendant. As such, this Court should adopt the approach of the Fifth Circuit and the Mississippi federal district courts and hold that a non-signatory to a contract containing an arbitration provision may compel arbitration against a signatory to the contract on the theory of equitable estoppel if two situations exist: (1) when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract; or (2) when the signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory. Therefore, I respectfully dissent because the Bank, as a non-signatory to the contract, is entitled to compel arbitration since Wedgeworth raises allegations of substantially interdependent and concerted misconduct by both the Bank and Rogers. Furthermore, "arbitration is favored in the law." *Grigson,* 210 F.3d at 526. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). The theory of equitable estoppel is applied in order to fulfill federal pro-arbitration policy. *Grigson*, 210 F3d at 528.

¶49. Since I believe that this Court should adopt the Fifth Circuit and our own federal district court approach and conclude that the Bank of Morton, as a non-signatory defendant, can compel arbitration through the theory of equitable estoppel, I must respectfully dissent. Wedgeworth's claims alleged substantially interdependent and concerted misconduct by both

22

Rogers and the Bank and as such equitable estoppel does apply. Furthermore, these claims do arise under the arbitration provision of the contract. Accordingly, I would hold that the circuit court erred in denying the motion to compel arbitration, and I would reverse and render.

**COBB, P.J., AND CARLSON, J., JOIN THIS OPINION.**