# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00054-COA

BACK BAY LAWNSCAPES LLC, LOWELL FOUNTAIN AND BETHANY FOUNTAIN      APPELLANTS

v.

CHRISTOPHER GRAHAM, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE MISSISSIPPI DEPARTMENT OF REVENUE      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/13/2023 |
| TRIAL JUDGE: | HON. TAMETRICE EDRICKA HODGES |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | JAMES GARY McGEE JR. |
| ATTORNEYS FOR APPELLEE: | WILLIAM JAMES DUKES MATTHEW T. HENRY |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 09/09/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND WEDDLE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Lowell and Bethany Fountain are a married couple living in Harrison County, Mississippi. Lowell is the sole owner of Back Bay Lawnscapes LLC (Back Bay), a lawn care and landscaping business located in D'Iberville, Mississippi. A seven percent sales tax is imposed on "landscaping" services pursuant to Mississippi law. Miss. Code Ann. § 27-65-23 (Supp. 2024). "Landscaping" is defined pursuant to regulations and "means any activity that modifies the grounds of any house, building or area of land by . . . [altering] the land," including "the planting of flowers, shrubs or trees and the establishment of lawns and

gardens. Landscaping also includes the building of landforms, retaining walls, flower beds, water features and other similar structures." 35 Miss. Admin. Code Pt. IV, R. 5.08(205) (2011). The regulation further provides that "[l]andscaping does not include tree trimming, grass cutting, hedge trimming, or similar maintenance activities; nor . . . the spreading or planting of materials provided by the owner when the charges for the non-taxable activities are listed separately on the invoice given to the customer." *Id.*

¶2.     The Mississippi Department of Revenue (MDOR) conducted a sales and use tax audit of Back Bay and an income tax audit of the Fountains. The audits resulted in a sales tax assessment against Back Bay for "landscaping" services[1] and an individual income tax assessment against the Fountains due to certain income tax deductions they took for charitable contributions and business expenses that were disallowed by the MDOR.

¶3.     Back Bay and the Fountains individually (collectively, the taxpayers) appealed these assessments, which the Hinds County Chancery Court ultimately affirmed by entering summary judgment in MDOR's favor, including any penalty and interest on each assessment. The taxpayers appealed, asserting that rather than granting summary judgment in the MDOR's favor, the taxpayers "were entitled to summary judgment as a matter of law."[2] Finding no error, we affirm the chancery court's order granting the MDOR's motion for summary judgment in relevant part, upholding the sales tax assessment against Back Bay and

---

[1] The MDOR also issued a use tax assessment to Back Bay that the chancery court ultimately abated in full. The MDOR did not cross-appeal the chancery court's order regarding the use tax assessment. It is not at issue in this appeal.

[2] In their appellate briefing, neither Back Bay nor the Fountains alternatively requested reversal and remand based on a genuinely disputed question of material fact.

the individual income tax assessment against the Fountains, along with penalties and interest.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**[3]

¶4.    The record reflects that before forming Back Bay, Lowell did business in Mississippi as a sole proprietor under the business name "Back Bay Lawn Care," providing landscaping and irrigation services, as well as general lawn care and maintenance.  Lowell (d/b/a Back Bay Lawn Care) had a sales tax permit and sales tax account with the Mississippi State Tax Commission (the MDOR's predecessor) from January 2003 until December 2009.  As a result of a prior audit for the period beginning January 1, 2001, through December 21, 2004, Lowell (d/b/a Back Bay Lawn Care) was found to owe additional sales tax.

¶5.    Back Bay—the business taxpayer here—was formed as a limited liability company on March 26, 2010, and likewise performed landscaping and lawn care services.  Nearly six years after forming Back Bay, Lowell first obtained a sales tax permit for Back Bay and opened a sales tax account with the MDOR on February 26, 2016.

¶6.    In March 2019, the MDOR notified Back Bay that it would be conducting a sales tax audit that ultimately covered the period January 1, 2015, through January 31, 2019.  At the same time, MDOR notified Lowell that it would be conducting an audit of his records, including those pertaining to his individual (or personal) income from January 1, 2015, through January 31, 2019.

¶7.    Following the audit, on December 4, 2019, the MDOR issued a sales tax assessment

---

[3] Unless otherwise indicated, all numbers and calculations throughout have been rounded to the nearest whole number.

3

to Back Bay for a total amount of $154,127[4] for the period January 1, 2015, through January 31, 2019, including penalties and interest. On the same date, the MDOR issued an individual income tax assessment to the Fountains for $26,843 for the period January 1, 2015, through December 31, 2017, including penalties and interest.

¶8. The taxpayers appealed the assessments to the MDOR Board of Review, which upheld the assessments after a hearing. The taxpayers then appealed to the Mississippi Board of Tax Appeals (BTA). After a hearing, the BTA issued orders on April 13, 2021, upholding the Board of Review's orders and amending them to reflect updated interest and penalties. The taxpayers then appealed the BTA's orders to the Hinds County Chancery Court on June 14, 2021.

¶9. Following discovery, the MDOR and the taxpayers filed motions for summary judgment. Regarding the sales tax assessment, the MDOR asserted that Back Bay failed to maintain adequate records to establish its gross taxable sales, so the MDOR's sales tax assessment was based upon "any information available" and was prima facie correct. *See* Miss. Code Ann. § 27-65-43 (Rev. 2022); Miss. Code Ann. § 27-65-37(1) (Rev. 2022). According to the MDOR, because Back Bay did not produce any evidence overcoming this presumption of correctness, the sales tax assessment should be affirmed as a matter of law.

¶10. Back Bay, on the other hand, asserted that it produced adequate records sufficient to establish taxable "landscaping" sales and non-taxable general lawn-care sales throughout the subject audit period. Thus, according to Back Bay, the sales tax assessment "should be

---

[4] The sales tax assessment notice provided that a payment of $241.31 had been received, which was credited against the $154,127.00 amount.

reduced to the proper amount of [sales] tax owed [as] established by the documentary evidence presented."

¶11. Concerning the income tax assessment, the MDOR asserted that the Fountains had claimed charitable contribution deductions and business expense deductions that were not supported by their records, thus arguing the income tax assessment against the Fountains should be affirmed as a matter of law.

¶12. In contrast, the Fountains asserted that they produced substantial evidence supporting their income tax deductions for charitable contributions and business expenses that were improperly disallowed by the MDOR. According to the Fountains, the chancery court should allow all those deductions as they originally claimed them.

¶13. Regarding penalties and interest, the MDOR asserted that they were properly assessed in accordance with statute and should be upheld. The Fountains disagreed, asserting that all penalties and interest should be abated in full.

¶14. The chancery court held a hearing on the parties' motions on June 30, 2022, and a second hearing on October 4, 2023. After considering the record, the evidence before it, the parties' arguments, and the applicable law, the chancery court granted the MDOR's summary judgment motion in relevant part, upholding the sales tax assessment against Back Bay and the individual income tax assessment against the Fountains, along with penalties and interest.

¶15. The taxpayers appealed. Back Bay asserts that the chancery court erred in upholding the sales tax assessment because Back Bay produced adequate records to establish that most of its sales related to nontaxable basic lawn maintenance, rather than "landscaping," and

5

these records were sufficient to establish "the gross proceeds of [taxable] sales of the business." The Fountains further assert that the chancery court erred in upholding the income tax assessment because the claimed charitable contribution and business expense income tax deductions disallowed by the MDOR were supported by substantial evidence. Lastly, the taxpayers assert that "the [chancery court] failed to adequately address penalties and interest" in the final judgment, and "penalties and interest are [not] warranted under the facts of the case."

## STANDARD OF REVIEW

¶16. "We review the grant of summary judgment de novo." *Jackson Land Food Mart Inc. v. Frierson*, 314 So. 3d 146, 150 (¶23) (Miss. Ct. App. 2021). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). Although "[t]he nonmovant should be given the benefit of every reasonable doubt," *Cothern v. Vickers Inc.*, 759 So. 2d 1241, 1245 (¶6) (Miss. 2000), Mississippi Rule of Civil Procedure 56 also provides that the nonmovant "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e). "If [the non-moving party] does not so respond, summary judgment, if appropriate, shall be entered against him." *Id.* "As to issues on which the nonmovant bears the burden of proof at trial, the movant needs only to demonstrate an absence of

6

evidence in the record to support an essential element of the movant's claim." *Rawan Hayaf LLP v. Frierson*, 323 So. 3d 555, 561 (¶10) (Miss. Ct. App. 2021) (quoting *Cothern*, 759 So. 2d at 1245 (¶6)).

## DISCUSSION

### I. Sales Tax Assessment

#### A. Applicable Law

¶17. "In Mississippi, sales tax is a privilege tax—one that grants the payor 'the privilege of engaging or continuing in business or doing business within this state[.]'" *Jackson Land Food Mart*, 314 So. 3d at 151 (¶24) (quoting Miss. Code Ann. § 27-65-13 (Rev. 2017)). Relevant here, a seven percent sales tax is imposed on businesses providing certain services, including "[g]rading, excavating, ditching, dredging or *landscaping*." Miss. Code Ann. § 27-65-23 (emphasis added). "Landscaping" is further defined by regulation, as follows:

> Landscaping means any activity that modifies the grounds of any house, building or area of land by contouring, forming or functional alteration of the land and includes the planting of flowers, shrubs or trees and the establishment of lawns and gardens. Landscaping also includes the building of landforms, retaining walls, flower beds, water features and other similar structures. Landscaping does not include tree trimming, grass cutting, hedge trimming, or similar maintenance activities; nor does it include the planting or spreading of materials provided by the owner when the charges for the non-taxable activities are listed separately on the invoice given to the customer.

35 Miss. Admin. Code Pt. IV, R. 5.08(205).

¶18. Mississippi sales tax law mandates that a taxpayer subject to sales tax

> *shall keep and maintain an accurate and complete set of records and other information sufficient to allow the department to determine the correct amount of tax due*. The records and other information shall be open and available for inspection by the department upon request at a reasonable time and location.

7

> Refusal or delay by the taxpayer to provide documentation for examination upon the department's request shall result in an assessment being made from any information available, which shall be prima facie correct.

Miss. Code Ann. § 27-65-42(4) (Supp. 2024) (emphasis added); *see also* Miss. Code Ann. § 27-65-43.[5]  Generally, the statute of limitations for assessing additional taxes on a return is thirty-six months from the date of filing.  Miss. Code Ann. § 27-65-42(1).  If no return is filed, however, this thirty-six-month limitation does not apply, and an assessment may be made at any time.  Miss. Code Ann. § 27-65-42(2).

¶19.     The sales tax law expressly addresses the ramifications resulting from a taxpayer's failure to maintain adequate records, as follows:

> If adequate records of the gross income or gross proceeds of sales are not maintained or invoices preserved as provided herein, or if an audit of the records of a taxpayer, or any return filed by him, or any other information discloses that taxes are due and unpaid, *the commissioner shall make assessments of taxes, damages, and interest from any information available, which shall be prima facie correct.*

---

[5] Section 27-65-43 provides:

> It shall be the duty of every person taxable under this chapter to keep and preserve for a period of three (3) years adequate records of the gross income, gross receipts or gross proceeds of sales of the business, including all invoices of merchandise purchased, all bank statements and cancelled checks, and all other books or accounts as may be necessary to determine the amount of tax for which he is liable. . . .  All records shall be open for examination, at any time, by the commissioner or his duly authorized agent.

> The commissioner may require any information or records from computer information systems on media common to those systems. Taxpayers' records may be sampled for audit purposes at the discretion of the commissioner and any assessment rendered as a result of same shall be considered prima facie correct.

Miss. Code Ann. § 27-65-43.

Miss. Code Ann. § 27-65-37(1) (emphasis added).

### B. Adequate Records Requirement

¶20. Back Bay does not dispute that it was engaged in providing landscaping services during the audit period. Thus, based upon the law delineated above, we find that because Back Bay was admittedly engaged in a taxable business, it had a duty to keep adequate records of its gross income from taxable "landscaping" services. Miss. Code Ann. § 27-65-42(4); Miss. Code Ann. § 27-65-43; *see also* 35 Miss. Admin. Code Pt. IV, R. 5.08(205) (providing that "landscaping" does not include certain activities such as "tree trimming, grass cutting, hedge trimming, or similar maintenance activities" or "planting or spreading of materials provided by the owner," provided that "the charges for the non-taxable activities are listed separately on the invoice given to the customer").

¶21. According to Back Bay, "the record clearly establishes that [it] produced a set of adequate records" for the audit period of January 2015 through January 2019 "sufficient for MDOR to determine the correct amount of [sales] tax due." Back Bay acknowledges that some of its records for this period were "unavailable because the hard drive in [Lowell's] . . . computer failed sometime in 2017" but points out that even so, Back Bay ultimately produced, among other records, "a complete set of bank statements [for the audit period]," a QuickBooks report of sales during the entire audit period entitled "Sales by Customer Detail for Audit Report" ("QuickBooks sales report"), copies of all Lowell's income tax returns that had been filed during the audit period, handwritten sales amounts for 2016 and

9

2017,[6] and sales invoices for 2018. Additionally, after the second summary judgment hearing—long after the audit—Back Bay filed five unsigned, undated "lawn maintenance agreements," which were attached to its supplemental response in support of its summary judgment motion.

¶22. For the reasons discussed below, we are not persuaded by Back Bay's "adequate records" argument. On the contrary, we find that Back Bay failed to fulfill its duty to keep adequate records of its gross income from taxable "landscaping" services. Miss. Code Ann. §§ 27-65-42(4), 27-65-43; *see also* 35 Miss. Admin. Code Pt. IV, R. 5.08(205). We recognize that Back Bay furnished the MDOR with over one thousand pages of documents and records. Nevertheless, based upon our review, we find that this information did not adequately show the amount of gross income Back Bay earned *from taxable landscaping services*—which is the crux of the sales tax dispute here. In short, Back Bay failed to keep adequate records "sufficient to allow the [MDOR] to determine the correct amount of tax due." Miss. Code Ann. § 27-65-42(4).

### 1. *The QuickBooks Sales Report*

¶23. Back Bay primarily relies on the QuickBooks sales report in asserting that it maintained adequate records to allow the MDOR to differentiate between its gross income from nontaxable routine lawn-care services and taxable landscaping services.[7] According

---

[6] Back Bay provides no specific record citation to these "handwritten sales amounts for 2016-2017." From our review of the record, we do not find any such documentation.

[7] Back Bay relies on the QuickBooks sales report in support of its own summary judgment motion and in opposing the MDOR's motion.

to Back Bay, the QuickBooks sales report summarizes the invoices for the entire audit period (January 1, 2015, through January 31, 2019). The report sets forth the invoice date and number, the customer name, a short general description of services, whether the sale was nontaxable or taxable, and the invoice amount.

¶24. As an initial matter, we find that the QuickBooks sales report is not competent summary judgment evidence. "[T]he content of summary-judgment evidence must be admissible at trial although the evidence may be in a form, such as an affidavit, that would not be admissible." *Ill. Cent. R. Co. v. Jackson*, 179 So. 3d 1037, 1043 (¶14) (Miss. 2015); *see* M.R.C.P. 56(e). The MDOR asserts that the QuickBooks sales report is inadmissible hearsay and fails to constitute competent summary judgment evidence. We agree.

¶25. We note that the MDOR raised its objections with respect to the QuickBooks sales report several times before the chancery court. The chancellor, however, did not appear to rule on these objections, and she appeared to have at least considered the QuickBooks sales report in her analysis. Nevertheless, upon our de novo review, we "must still determine whether a party has carried its summary-judgment burden based upon the evidence presented to the court," which must be "competent evidence under the requirements of Rule 56." *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 91 (¶20) (Miss. 2013).

¶26. "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted," *Crist v. Loyacono*, 65 So. 3d 837, 844 (¶21) (Miss. 2011) (citing MRE 801(c)), which must "fall into one of the enumerated exceptions to the general hearsay rule" in order to be admissible. *Id.* Although Mississippi Rule of Evidence 803(6) delineates a business

11

records exception, the record on appeal contains no affidavit or other sworn testimony addressing the requisite conditions a record must meet in order for this exception to apply. *See* MRE 803(6)(A)-(D).

¶27. The business records exception requires that in order to be admissible, the record must be "made at or near the time by—or from information transmitted by—someone with knowledge," it must be "kept in the course of a regularly conducted activity of a business," and "making the record [must be] a regular practice of that activity." MRE 803(6)(A)-(C). Subparagraph (D) requires that these conditions be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11)." MRE 803(6)(D). No such affidavit or certification is in the record.

¶28. Back Bay downplays its failure to file an affidavit with respect to the QuickBooks sales report because the MDOR stipulated to its authenticity at the summary judgment hearing. As the record reflects, however, the MDOR preserved its objections that the QuickBooks sales report would still not be admissible under MRE 803(6) even if it had been accompanied by an affidavit. More importantly, *we* have no affidavit in the record before us, and we can only review what the record on appeal contains.

¶29. We observe that the QuickBooks sales report is entitled "Sales by Customer Detail For Audit," which certainly suggests that the report was prepared for the audit—rather than being a record kept as "a regular practice" of Back Bay's business activities. Further, even if the QuickBooks sales report could constitute a summary of other documents (i.e., Back Bay's invoices), nothing in the record indicates that the MDOR had been provided sufficient

12

supporting documentation, as required for admissibility pursuant to MRE 1006.[8] The QuickBooks sales report purportedly summarizes all invoices for the entire audit period (January 1, 2015, through January 31, 2019)—but of the 818 invoices that are actually in the record and that were provided for the MDOR's review, nearly all the invoices are from 2018. Specifically, 812 invoices are from 2018. There is only one invoice from each of the years 2014, 2015, and 2016, and there are only three invoices from 2019.

¶30. "As an appellate court, we 'may only act on the record presented to [us].'" *Roley v. Roley*, 329 So. 3d 473, 508 (¶114) (Miss. Ct. App. 2021) (quoting *Oakwood Homes Corp. v. Randall*, 824 So. 2d 1292, 1293 (¶4) (Miss. 2002)). Based upon the record before us, we find that the QuickBooks sales report is inadmissible hearsay and does not constitute competent summary judgment evidence.

### 2. *Inconsistent and Incomplete Records*

¶31. Even if the QuickBooks sales report is considered, we still find that Back Bay's records were inadequate. Our review of the record shows that the records produced by Back Bay are incomplete, and even among the documents produced, there are numerous inconsistencies. We find that Back Bay's records were inadequate for these additional reasons, as detailed below.

¶32. Back Bay's own response to the MDOR's motion for summary judgment illustrates

---

[8] Rule 1006 provides that a "proponent [of evidence] may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." MRE 1006. In order to do so, however, "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court." *Id.*

13

the inconsistencies in its records. In that response, Back Bay included the following chart[9] that Back Bay explained was derived from records it provided the MDOR:[10]

| [Year] | Bank Statements[11] | Sales Invoices | Sales by Customer Detail Reports[12] | Schedule C[13] |
|--------|---------------------|----------------|--------------------------------------|----------------|
| 2015 | $426,509 | - | $378,451 | $456,551 |
| 2016 | $519,956 | - | $422,629 | $552,872 |
| 2017 | $437,424 | - | $489,314 | $502,847 |
| 2018 | $599,093 | $490,405 | $486,021 | - |

¶33. As Back Bay's chart indicates, for 2015, its own calculations show a 17% variance between the QuickBooks sales report and the 2015 Schedule C—i.e., the QuickBooks sales report is missing 17% of the sales Lowell reported for Back Bay on his income tax return in 2015. Also, there is a 7% variance between the sales shown by 2015 bank statements and the 2015 Schedule C. Counsel for Back Bay explained at the first summary judgment hearing that this variance resulted because the taxpayers did not deposit all their cash

[9] For ease of reference, we omit the January 2019 entry.

[10] Back Bay attached these records as exhibits to its summary judgment motion.

[11] The amounts shown in the "Bank Statements" column of Back Bay's chart are derived from totaling Back Bay's bank statements for its operating account for each year.

[12] The "QuickBooks sales report" reflects these entries.

[13] Schedule C is a tax form included with Lowell's income tax return that sets forth the "Profit or Loss From Business (Sole Proprietorship)."

14

income.[14]

¶34.	In 2016, the variances were greater:  The QuickBooks sales report is missing 24% of the sales shown on Lowell's Schedule C and 19% of the sales deposited as shown on the 2016 bank statements.

¶35.	In 2017, the QuickBooks sales report is $489,314, which Back Bay points out is "only approximately 3% less" than the $502,847 sales amount reported on Lowell Fountain's Schedule C.  We find it significant, however, that this is the *only* example that Back Bay points to in asserting that the MDOR's "inconsistent records" assertions  are "not entirely true."  In any event, even in 2017, as Back Bay's chart illustrates, there was an 11% variance between the 2017 bank statements and the QuickBooks sales report and a 13% variance between the 2017 bank statements and Lowell's Schedule C.

¶36.	No Schedule C was available for 2018, as Back Bay's chart shows.  However, comparing the 2018 bank statements' amount ($599,093) to the $486,021 amount shown in the QuickBooks sales report shows a 19% variance between these figures—i.e., according to Back Bay's own figures, the QuickBooks sales report is missing 19% of the sales deposited into Back Bay's operating bank account.  To be sure, Back Bay's chart reflects just a 1% variance in the 2018 sales invoices and the QuickBooks sales report amount, but we find this point is largely outweighed by MDOR's point that the 2018 bank statement amount ($599,093) indicates that both the QuickBooks sales report and the 2018 invoices are missing

---

[14] Back Bay's counsel stated, "I agree that there is a discrepancy between the bank statements and the Schedule C. In a perfect world those should reconcile. But it's been clearly presented throughout the scope of the audit, throughout all the litigation, everything, that not all of the—or none of the cash was deposited."

over $100,000 in sales.

¶37. The affidavit of Kimberly McHenry, the auditor in this case, was attached as Exhibit C to the MDOR's summary judgment motion. Her testimony further illustrates the inadequacies of Back Bay's records. McHenry states in her affidavit that "much of the information in the [QuickBooks sales report] was found to be inaccurate and the spreadsheet as a whole appeared to be inaccurate." McHenry prepared a "Sampling of Invoice, Check, and/or [QuickBooks sales report] Discrepancies," which was attached to her affidavit as exhibit 4, "to illustrate some of the discrepancies and inaccuracies that were identified." These discrepancies include invoices that are not present in the QuickBooks sales report and invoices with an entirely different description, amount, or customer than what is shown in the QuickBooks sales report.[15] Additionally, upon our own review of the 2018 invoices to the QuickBooks sales report, we note, for example, that some invoices describe landscaping services and provide that the invoice amount "includes sales tax." The QuickBooks sales report, however, shows that the particular invoice transactions were "Non-Taxable."

¶38. In short, we find that Back Bay's incomplete and inconsistent records show that it failed to fulfill its statutory duty to keep adequate records "sufficient to allow the [MDOR] to determine the correct amount of tax due." Miss. Code Ann. § 27-65-42(4).

### 3. The 2018 Invoices and "Lawn Maintenance

---

[15] In one instance, for example, Back Bay produced a 2018 invoice for $3,500 with no sales tax charged, and the QuickBooks sales report shows this transaction as nontaxable. The deposit images in Back Bay's bank statements, however, showed the customer actually paid $3,745, which is 7% more than the amount shown on the invoice. We find it reasonable for the MDOR to infer that Back Bay charged, and its customer paid, sales tax on the transaction in question, although the QuickBooks sales report listed the sale as nontaxable.

16

*Agreements"*

¶39.  Back Bay also asserts that the 2018 invoices and QuickBooks sales report are sufficient records to allow the MDOR to distinguish taxable (landscaping) sales from nontaxable (routine lawn care) sales to assess the correct amount of the sales tax Back Bay owed.  We are not convinced by Back Bay's assertions for the reasons stated above and the additional reasons we discuss below.

¶40.  We recognize that many of the 2018 invoices contain the description "lawn maintenance package" with respect to the services provided.  Back Bay asserts this "obviously" describes general, nontaxable lawn care, but Back Bay's argument is belied by its own invoice entries.

¶41.  Our review shows that some of these invoices, despite describing a "lawn maintenance package," *also* show a state sales tax charge for those services.  Indeed, these inconsistencies, coupled with the other inconsistencies described above, illustrate the overarching problem here.  As the MDOR points out, Back Bay never provided any customer contracts or other documentation to establish precisely what services are included in a "lawn maintenance package" for the years included in the audit.  As such, the "lawn maintenance package" description or similar descriptions in the invoices provided the MDOR with very little help in ascertaining what portion of Back Bay's gross income is exempt from sales tax.

¶42.  We find it relevant that the record reflects McHenry asked Lowell for such contracts and explained to him that Back Bay's invoices needed to clearly show what services were taxable and nontaxable.  Although McHenry stated in her affidavit that Lowell claimed to

17

have customer contracts, none were ever provided to the MDOR in connection with the audit.[16]

¶43. Although we apply our own de novo review in assessing this issue, we do find it telling that in affirming the sales tax assessment, the BTA found it significant that Back Bay lacked corroboration for its purported nontaxable "lawn maintenance package" services. The BTA further observed that neither "[Back Bay] [n]or [Back Bay's] representative appear[ed] at the hearing to allow this Board to inquire further about [Back Bay's] assertions."

¶44. The chancellor was likewise frustrated with Back Bay's failure to provide any documentation or explanation regarding what services a "lawn maintenance package" encompassed, raising this point at the first summary judgment hearing. When the chancellor asked Back Bay's counsel whether there were any additional documents, he responded, "Everything that we have has been produced."[17]

¶45. At the second summary judgment hearing, the chancellor again asked about whether

---

[16] In particular, after concluding the audit, McHenry met with Lowell to present the audit results. As McHenry stated in her affidavit, she explained to him that she "would need contracts and a breakdown of the various services Back Bay provides in order to allow additional exempt sales." McHenry said that "[w]hile Mr. Fountain claimed that he did have contracts, none have been provided to date. I also explained to Mr. Fountain that his invoices should show a breakdown of taxable and non-taxable work and services in the future and advised him to keep contracts and invoices for each customer."

[17] We note that before filing their summary judgment motions, the parties engaged in discovery in the chancery court. The MDOR's requests for production of documents included a request for "any and all sales agreements, service agreements, maintenance agreements, or other contracts between Back Bay and any of its customers regarding any sales made or services provided by Back Bay during the Audit Period." The taxpayers' response provided that they were "not in possession of any responsive documentation." Based upon the record before us, the taxpayers did not supplement this response.

there were any lawn maintenance agreements or any additional documents at all. Back Bay's counsel again said that "everything that we have has been provided to this Court." Even so, at the end of the hearing, the chancellor allowed the parties two weeks to provide additional documents.

¶46. Thus, on October 17, 2023 (four years and seven months after Back Bay received the MDOR's March 2019 notice of a sales tax audit), Back Bay filed a supplemental response that had attached five unsigned, undated agreements. Back Bay asserted that these agreements "reflect what kind of services were typically included in a 'lawn maintenance package' offered by Back Bay during the subject audit period." These agreements list services such as "mowing, edging, weed eating, hedge trimming, tree trimming, and debris removal" as the services to be provided under the agreement.

¶47. Back Bay admitted that it was "unable to locate any signed and dated copies of these agreements" but explained that

> these agreements were typically prepared and sent to prospective customers as proposals. Back Bay would then simply follow up with the prospective customer, whether by email or telephone call, and request confirmation that the services and payment arrangements set out in the proposal were acceptable. Back Bay did not typically require its customers to sign and return these "Lawn Maintenance Agreements."

¶48. We recognize that the services described in these agreements include services such as mowing, edging, weeding, trimming bushes, and "blowing off all hardscapes" that are not activities considered "landscaping" activities. *See* 35 Miss. Admin. Code Pt. IV, R. 5.08(205). But we find that these documents are not admissible for summary judgment purposes.

19

¶49.  In particular, the record contains no affidavit authenticating the documents or establishing their admissibility under any exception to the hearsay rule.  *See* MRE 803(6), 902(11).  Further, these agreements are unsigned and undated; thus, it is impossible to tell whether these documents were prepared during the audit period or whether the terms set forth in the agreements were agreed to by the customer.  Indeed, upon review, we find that of the five customers named in the produced agreements, three of these customers were not even listed in the QuickBooks sales report that Back Bay insists covers all invoices from the audit period.  Also troubling is that throughout the audit period—and indeed, most of the appeal process—Back Bay never produced any documentation purportedly explaining the "lawn maintenance package" reference, and Back Bay never offered any explanation of how the taxpayers came upon the agreements they ultimately produced.

### 4.  *Back Bay's "Landscaping" Business Designation*

¶50.  As a final point with respect to the inadequacy of Back Bay's records, we observe that Back Bay's annual reports for 2015, 2018, and 2019 filed with the Mississippi Secretary of State's Office provide that the nature of Back Bay's business is "landscaping services."[18] Similarly, the Schedule C forms filed with Lowell's income tax returns provide that Back Bay's principal business is "landscaping."  Back Bay points out that it had no choice but to describe Back Bay's principal business activity as landscaping because "landscaping" was the only viable option under the available codes.  Although true, the lack of more specific codes is all the more reason for Back Bay to have been extra vigilant in its record-

---

[18] The record does not contain annual reports for Back Bay for 2016 and 2017.

keeping—to ensure that its nontaxable lawn-care services were explicitly distinguished from the "landscaping" services it also performed. *See, e.g.*, Miss. Code Ann. § 27-65-42(4); *see also* 35 Miss. Admin. Code Pt. IV, R. 5.08(205) (providing that "non-taxable activities are [to be] listed separately on the invoice given to the customer"). Back Bay failed to do so.

### 5. *Conclusion Regarding the Adequacy of Back Bay's Records*

¶51. For all the reasons addressed above, we find that Back Bay failed to fulfill its duty to keep adequate records "sufficient to allow the [MDOR] to determine the correct amount of tax due." Miss. Code Ann. § 27-65-42(4). We turn now to the applicable burden of proof under these circumstances.

### C. Burden of Proof

¶52. Back Bay insists that it did, in fact, produce adequate records in this case, so it was then the MDOR's burden to establish that "its taxing power applied to transactions in question." Back Bay relies on *Castigliola v. Mississippi Department of Revenue*, 162 So. 3d 795 (Miss. 2015), for this proposition. We find *Castigliola* inapplicable and are unpersuaded by Back Bay's argument.

¶53. *Castigliola* involved the taxpayer's purchase of a yacht and the assessment of a use tax on that purchase. *Id.* at 797 (¶¶5-6). Castigliola argued the transaction was a "casual sale" specifically excluded from Mississippi sales and use tax laws. *Id.* at 801 (¶20). Addressing the proper burden of proof on this point, the Mississippi Supreme Court began its analysis by recognizing the general proposition that under Mississippi law, "the [MDOR] has the burden to prove a tax applies, and the taxpayer has the burden then to prove an

exemption applies." *Id.* at 797 (¶2). With this general principle in mind, the supreme court held "that the casual-sales exception to sales and use tax is an exclusion and not an exemption"; thus, "MDOR had the burden to prove Castigliola's boat purchase was within the State's statutory authority to tax." *Id.* at 801 (¶22).

¶54. In contrast to *Castigliola*, Back Bay does not dispute that it earned some gross income from landscaping services and that this portion of its gross income is subject to sales tax. The dispute lies not in the MDOR's authority to tax this portion of Back Bay's gross income but, rather, in how much gross income Back Bay earned from its taxable landscaping services. This amount is ascertainable only from Back Bay's records. In short, the issue here turns on Back Bay's duty to "keep and maintain" adequate records "sufficient to allow the department to determine the correct amount of tax due," Miss. Code Ann. § 27-65-42(4)—a duty that Back Bay failed to fulfill, as we have addressed above. This issue never arose in *Castigliola*. In light of this fundamental and pivotal distinction, we find that *Castigliola* has no application here. Instead, the mandate set forth in section 27-65-37(1) applies, as we set forth above and as we address in further detail in the following paragraph.

¶55. Section 27-65-37(1) provides that if a taxpayer fails to keep "adequate records of the gross income or gross proceeds of sales"—as here—then "the commissioner shall make assessments of taxes, damages, and interest from any information available, which shall be prima facie correct." Miss. Code Ann. § 27-65-37(1). Thus, pursuant to this mandate, an "auditor is not required to use 'the best information available' to make an assessment; [rather,] 'in order for the assessments to be prima facie correct, the auditor must make them

22

from any information available.'" *BBM Ventures LLC v. Frierson*, 346 So. 3d 498, 504 (¶19) (Miss. Ct. App. 2022) (quoting *Jackson Land Food Mart*, 314 So. 3d at 151 (¶28)). *Accord United Roofing & Constr. of MS Inc. v. Miss. Dep't of Revenue*, 319 So. 3d 1164, 1173 (¶25) (Miss. Ct. App. 2020).

¶56.    The burden then shifts to the taxpayer, i.e., Back Bay, to prove by competent evidence that a dispute as to the correctness of the assessment exists: "Once the auditor's assessment is made and the presumption of prima facie correctness attaches, the taxpayer bears the burden of proof showing that a genuine dispute exists regarding the correctness of the assessment." *Id.* at 504-05 (¶19). In this regard, "[t]he presumption of correctness has been compared 'with Mississippi Rule of Evidence 301 on presumptions in civil cases. . . . " *Jackson Land Food Mart*, 314 So. 3d at 151 (¶29) (quoting MRE 301)). "In civil cases, 'the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption." *Id.* As we address below, we find that Back Bay failed to do so.

### D.    Back Bay's Taxable Sales

¶57.    As discussed, the MDOR's $122,136 sales tax assessment[19] is prima facie correct. To

---

[19] This amount does not reflect the additional interest and penalties. Due to the lack of adequate records, the MDOR was authorized by statute to make its assessment "from any information available." Miss. Code Ann. § 27-65-37(1). Here, the MDOR auditor used the gross income as stated on the Schedule C forms as a starting point. "[T]he non[]taxable sales were [then] calculated using the deposit information for 2018," as Back Bay had produced check images from this year. All sales of $100 or less were subtracted from the 2018 gross income in "an attempt to estimate what would be smaller transactions that might be expected to just be maintenance activities like lawn cutting," as well as all amounts where the check memo line indicated a non-landscaping service. Additionally, all amounts attributable to exempt customers, such as governmental customers, were removed because these customers were not subject to sales tax. As McHenry explained in her work papers, "[a] percentage was [then] calculated using the 2018 exempt deposits. This percentage was

avoid summary judgment in the MDOR's favor, Back Bay had the burden of overcoming this presumption of correctness with competent proof. We find that Back Bay failed to do so, and, therefore, the chancery court properly ordered summary judgment in the MDOR's favor on the sales tax issue.

¶58. Indeed, Back Bay asserts that summary judgment should have been granted in *its* favor on this issue, and thus it does not seek reversal and *remand* on this issue. Rather, Back Bay asserts that this Court should reverse the chancellor's order and render summary judgment in Back Bay's favor. Specifically, Back Bay insists "that the only records that consistently show whether a sale was taxable or not were its sales invoices and the QuickBooks sales report," and based on these records, "[its] sales invoices indicate that Back Bay only owes approximately $364[] in additional sales tax to [the] MDOR." We are unconvinced by Back Bay's arguments.

¶59. For the reasons we have already addressed above, we find that these records do not constitute reliable, competent proof of taxable sales. "The lack of adequate records alone gives rise to the presumption that the Commissioner's assessments are prima facie correct," *Jackson Land Food Mart*, 314 So. 3d at 152 (¶35) (quoting *Marx v. Bounds*, 528 So. 2d 822, 825 (Miss. 1988)). Back Bay points to no other records to support its contention. Back Bay has failed to overcome the presumed correctness of the MDOR's sales tax assessment for this reason alone.

---

applied to each year['s] sales to calculate non[]taxable deposits for each year." Back Bay asserts this method was "arbitrary." We need not address that assertion, however, because Back Bay failed to rebut the statutory presumption of correctness applicable to the MDOR's assessment in the first instance, as we have detailed above.

¶60. Our determination on this point is further supported by Back Bay's spotty and inaccurate reporting history, as well as its own widely varying taxable sales calculations offered throughout this litigation, as we discuss below.

### 1. *Back Bay's Sales Tax Reporting History*

¶61. With respect to its reporting history, Back Bay admitted in response to requests for admissions that a portion of its Schedule C gross income for 2015, 2016, and 2017 was from services and other sales that are taxable under section 27-65-23. Indeed, Back Bay does not dispute that it had taxable sales in each of the years included in the sales tax audit. Yet the record reflects that in 2015 Back Bay did not file any sales tax returns or pay any sales tax on its admittedly taxable sales in 2015, and did not even obtain a sales tax permit until February 26, 2016. Although Back Bay reported $21,931 in taxable sales in 2016, Back Bay reported $0 in taxable sales in 2017 and 2018, even though it now admits it made taxable sales during those years.

### 2. *Back Bay's Varying Taxable Sales Calculations*

¶62. Additionally, Back Bay presented widely varying taxable-sales calculations during the course of this litigation. We find that this point further demonstrates the unreliability of the records Back Bay relied on to make these calculations—that is, its invoices and QuickBooks sales report. From Back Bay's first filing before the BTA in December 2020 through its February 2025 Appellants' Reply, Back Bay's own purported taxable sales calculations for the audit period substantially decreased with each iteration.

¶63. The record reflects that in Back Bay's December 2020 BTA filing, it contended its

25

taxable sales for the audit period were $480,841. A year later, in a February 2021 BTA filing, Back Bay asserted its taxable sales for the audit period equaled $315,971. Then, in February 2022, Back Bay asserted in its summary judgment briefing that its total taxable sales for the audit period totaled $193,156.[20] Finally, Back Bay's February 2025 Appellants' Reply indicates that its net taxable sales for the audit period totaled $67,480.[21]

¶64. Thus, from its $480,841 December 2020 taxable sales calculation to its most recent $67,480 taxable sales calculation in February 2025, Back Bay's own taxable sales calculations covered a $413,361 range. Back Bay's own inability to consistently calculate its taxable sales is an additional factor demonstrating that it wholly failed to rebut the statutory presumption of correctness given to the MDOR's sales tax assessment.

### E. Conclusion Regarding the Sales Tax Assessment

¶65. In short, although Back Bay may have had less taxable sales than those the MDOR calculated, Back Bay offered no specific, reliable evidence supporting that contention or to overcome the statutory presumption of correctness applicable to the MDOR's sales tax assessment. Accordingly, for all the reasons discussed, we find that the chancery court was correct in granting summary judgment in MDOR's favor and upholding the sales tax assessment.

### II. The Fountains' Disallowed Income Tax Deductions

---

[20] Namely, the figures were $80,748 in taxable sales for 2015; $42,964 for 2016; $53,425 for 2017; and $16,019 for 2018.

[21] The table Back Bay created in its reply brief on appeal lists $14,166 for 2015; $17,155 for 2016; $16,506 for 2017; $19,178 for 2018; and $475 for January 2019, totaling $67,480.

¶66. In the income tax audit, the MDOR disallowed all the Fountains' Schedule A deductions for charitable contributions and all their Schedule C deductions for Back Bay's car and truck expenses, repair and maintenance expenses, and supplies expenses. The Fountains assert that the chancery court erred when it upheld the disallowed deductions and granted summary judgment in the MDOR's favor on this issue.[22] We disagree with the Fountains' assertions for the reasons addressed below.

¶67. "Deductions on an income tax return are not a matter of right; they are a statutory grant, which must be provided [for] clearly under the statute. . . . The taxpayer has the burden of proving that the facts bring the case squarely within the deduction provisions of the statute." *Purcell Co. v. Miss. State Tax Comm'n*, 569 So. 2d 297, 301 (Miss. 1990); *accord BBM Ventures LLC*, 346 So. 3d at 506 (¶26).

### A. The Fountains' Charitable Deductions

¶68. Pursuant to Mississippi law, an individual may claim an income tax deduction for "[t]he amount allowable for individual nonbusiness itemized deductions for federal income tax purposes where the individual is eligible to elect, for the taxable year, to itemize deductions on his federal return" except for certain excluded deductions not relevant here. Miss. Code Ann. § 27-7-17(3)(a) (Rev. 2017). As such, a deduction for charitable contributions is allowable for Mississippi income tax purposes only if that deduction is allowable for federal income tax purposes. Relevant here, a charitable contribution is only

---

[22] The chancery court recognized that the MDOR's assessment is presumed correct and found that the Fountains failed to show a genuine dispute existed with respect to the correctness of the assessment. *See* Miss. Code Ann. § 27-7-49(3) (Rev. 2017); *Rawan Hayaf LLP*, 323 So. 3d at 565 (¶22).

recognized if it is made to an entity in one of the categories described in 26 U.S.C. § 170(c). Further, no charitable deduction is allowed "for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization." 26 U.S.C. § 170(f)(8)(A).

¶69. The record reflects that the Fountains claimed $9,465 in charitable deductions against their 2015 income taxes, $9,359 in charitable deductions against their 2016 income taxes, and $9,453 in charitable deductions against their 2017 income taxes. As support for these charitable deductions, the Fountains rely on a five-page "sampling" of check images, with one check highlighted on each page. Upon review, we find that most of the information on these check images is illegible. Although acknowledging that some of the checks are illegible, the Fountains point to one legible check as an example of a properly supported charitable deduction. The check is made out to "St. Mary's" for the amount of $50.00, and the check's memo line reads "charity dinner." The record, however, contains no receipt or other acknowledgment showing the *value* of that contribution, which may only be an amount equaling the difference between the amount paid and the value of the dinner, as required pursuant to federal law.[23]

¶70. Indeed, as the MDOR points out, the Fountains never provided any written acknowledgment or other substantiation of their claimed charitable donations, nor could Lowell offer any explanation for these deductions. McHenry, the auditor, explained in her

---

[23] Pursuant to IRS Publication 526 (2024), "Charitable Contributions," if a taxpayer "receive[s] a benefit as a result of making a contribution to a qualified organization, [the taxpayer] can deduct only the amount of [his] contribution that is more than the value of the benefit [he] receive[s]." *See* IRS Pub. 526, 2024 WL 5712113, at *4 (Jan. 1, 2024).

affidavit that when she met with Lowell at the conclusion of the audit, Lowell "stated that he did not know where the amount of charitable contributions claimed on his income tax returns came from."

### B. The Fountains' Business Expense Deductions

¶71. An income deduction is allowable under Mississippi law for "[a]ll the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Miss. Code Ann. § 27-7-17(1)(a). It is not enough, however, for a taxpayer to show that purchases were made or expenditures occurred. Rather, "for a business expense to be deductible it must be paid or incurred in connection with the carrying on of a trade or business of a taxpayer." *Purcell*, 569 So. 2d at 301. "To be 'ordinary and necessary' the expenditure must have some reasonably proximate relation to the customary conduct of the taxpayer's business." *Id.* at 302 (quoting *State v. L. & A. Contracting Co.*, 241 Miss. 783, 794, 133 So. 2d 546, 550 (1961)). In other words, to meet their burden of proof, the Fountains were required to present evidence showing that any claimed business purchases or expenditures related to Back Bay's business. Upon review, we find that the Fountains failed to meet their burden of proof with respect to the claimed business expenses at issue here.

¶72. Regarding claimed car and truck expenses, McHenry explained in her affidavit that she met with Lowell at the conclusion of the income tax audit, and "[he] stated that [these claimed expenses] were based on mileage and that he had mileage logs. Nonetheless, no mileage logs have been provided to date."

29

¶73. Upon review, we find that the record on appeal likewise contains no mileage logs. Indeed, during discovery in the chancery court, the Fountains responded, "Admitted," to the following request for admission propounded by the MDOR: "Please admit that you have not produced any mileage logs to the Department in support of the car and truck expenses which you claimed as deductions on your 2015, 2016, and 2017 Schedule C for Back Bay."

¶74. The Fountains rely on five pages of statements that were attached to their income tax returns as support for their car and truck expenses, but these statements simply set out the total amount of miles each vehicle was driven in a given year and the amount of the claimed deduction, based on the standard mileage rate.[24] In contrast, according to IRS Publication 463 (2024), an IRS-compliant mileage log should include the date, the mileage driven for each business use, the purpose of each business trip, as well as odometer readings for the beginning and end of the year. *See*, *supra*, note 24. The Fountains' supporting documentation for their business car and truck expenses falls far short of these guidelines. We find no error in the chancery court's determination that the information provided by the Fountains failed to properly substantiate their claimed car and truck expenses.

¶75. With respect to other business deductions, the Fountains refer to approximately eighty pages of credit card statements, but they point to no receipts, invoices, or other evidence of the business nature of any particular purchases shown on these statements. This is so even though the Fountains admit that these credit cards were used for both personal and business

---

[24] According to IRS Publication 463 (2024), "Travel, Gift, and Car Expenses," an IRS-compliant mileage log should include the date, the mileage driven for each business use, the purpose of each business trip, as well as odometer readings for the beginning and end of the year. IRS Pub. 463, 2024 WL 6084701, at *33-34 (Jan. 1, 2024).

expenses. As a matter of common sense, we find that particularly under these combined-use circumstances, some additional evidence is necessary to establish that any particular "expenditure . . . [has] some reasonably proximate relation to the customary conduct of the taxpayer's business." *Purcell*, 569 So. 2d at 302.

### C. Conclusion Regarding the Income Tax Assessment

¶76. In sum, we find that with respect to both their claimed charitable and business expense deductions, the Fountains wholly failed to point to any statutory or legal authority supporting their position or any evidence in the record meeting their "burden of proving that the facts bring the case squarely within the deduction provisions of the statute." *Id.* at 301. Accordingly, we find that this assignment of error is without merit.

### III. Penalties and Interest

¶77. The taxpayers brought their appeal pursuant to Mississippi Code Annotated section 27-77-7 (Rev. 2017), which sets forth the procedure for obtaining judicial review of a BTA order. Section 27-77-7(5) provides, in relevant part, that "[u]pon the filing of [a] petition" seeking judicial review,

> [t]he chancery court shall try the case de novo and conduct a full evidentiary judicial hearing on all factual and legal issues raised by the taxpayer which address the substantive or procedural propriety of the actions of the [MDOR] being appealed. . . . The chancery court shall decide all factual and legal questions presented, *including those as to legality and the amount of tax, refund, tax credit or tax incentive due as well as whether and to what extent the imposition of interest and/or penalties are warranted under the facts of the case*.

Miss. Code Ann. § 27-77-7(5) (emphasis added). Citing the italicized portion of section 27-77-7(5), the taxpayers assert that the chancellor committed reversible error because she did

31

not make a determination in her summary judgment order regarding "whether and to what extent penalties and/or interest are warranted under the facts of this case." We are not persuaded by the taxpayers' assertions on this point for the reasons addressed below.

¶78. The chancellor upheld the MDOR's impositions of penalties and interest in her summary judgment order, as follows: "All penalties and interest assessed for outstanding sales and individual income taxes are upheld." In asserting that the chancellor erred in failing to further elaborate on this issue, the taxpayers overlook that they sought *summary judgment* on this issue—as did the MDOR. We find no language in section 27-77-7 or in the Mississippi Rules of Civil Procedure that requires the chancery court to provide further elaboration in the summary judgment context.

¶79. We recognize that a trial court is required to set forth its findings of fact and conclusions of law following a bench trial when requested by a party pursuant to Rule 52.[25] Relevant here, however, is that no such requirement arises in the summary judgment context: "Even though evidence may be received by way of sworn affidavits, deposition testimony, and other such evidence, a Rule 56 summary judgment hearing is not an action 'tried upon the facts without a jury' so as to trigger Rule 52 applicability." *Landrum v. Livingston Holdings LLC*, 396 So. 3d 1026, 1041 (¶58) (Miss. 2024) (quoting *Harmon v. Regions Bank*, 961 So. 2d 693, 700 (¶24) (Miss. 2007)). Even if Rule 52 applied, the taxpayers made no request for findings of fact here.

---

[25] Rule 52(a) provides: "In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon and judgment shall be entered accordingly." M.R.C.P. 52(a).

¶80.	In any event, we must apply our own de novo review with respect to this issue, and we may affirm the chancellor's determination if we "find[] that the [chancellor] reached the right result despite . . . [purportedly] flawed or erroneous premises." *Harbit v. Harbit*, 3 So. 3d 156, 163 (¶24) (Miss. Ct. App. 2009). We find no error in the chancellor upholding the penalties and interest on the sales and income tax assessments in this case. Accordingly, we affirm the chancellor's determination on this issue.

¶81.	Specifically, the penalties and interest were imposed entirely within the scope of the authorizing statutes. Regarding the sales tax assessment, the MDOR assessed the ten percent damages and interest authorized by section 27-65-39, as follows:

> If any part of the deficient or delinquent tax is due to negligence or failure to comply with the provisions of [the Mississippi Sales Tax Law] . . . or authorized rules and regulations promulgated under the provisions of [the Mississippi Sales Tax Law] . . . without intent to defraud, there may be added as damages ten percent (10%) of the total amount of deficiency or delinquency in the tax. . . .

> For taxes assessed by the commissioner on or after January 1, 2015, the rate of any interest assessed under this section shall be: . . . One-half of one percent (½ of 1%) per month for such taxes assessed on or after January 1, 2019.

Miss. Code Ann. § 27-65-39 (Rev. 2022).

¶82.	As we have discussed above, Back Bay failed to comply with the Mississippi Sales Tax Law by failing to keep adequate records of its gross income; failing to collect and remit the correct amount of sales tax due; and, in 2015, by engaging in a taxable business without obtaining a sales permit until February 26, 2016. *See* Miss. Code Ann. §§ 27-65-23, 27-65-31 & 27-65-43. As such, Back Bay's actions fall squarely within the criteria listed in

33

section 27-65-39.

¶83. Regarding the income tax assessment, interest and penalties were applied pursuant to Mississippi Code Annotated section 27-7-51 (Rev. 2017). Sections 27-7-51(2) and 27-7-51(6) authorize the MDOR to assess interest at one-half of one percent (0.5%) per month from the due date of the return. The MDOR is also authorized to assess a penalty of one-half of one percent (0.5%) per month, not to exceed twenty-five percent total, as long as the failure to pay the assessed taxes continues. Miss. Code Ann. § 27-7-51(3). Additionally, for a taxpayer's failure to file income tax returns by the due date, the MDOR may assess a penalty of five percent per month, not to exceed twenty-five percent total. Miss. Code Ann. § 27-7-53(4) (Rev. 2017).

¶84. The taxpayers assert that because these statutes are discretionary, penalties and interest should not have been imposed. Yet the taxpayers point to no evidence that the penalties and interest were miscalculated or wrongly imposed, nor do they describe any mitigating circumstances or action on their part that would warrant foregoing the penalties and interest. Rather, the only argument the taxpayers make with respect to this issue is that according to them, "[g]iven the glaring errors in MDOR's sales tax and income tax audits, it is clear that the penalties and interest in dispute are unwarranted under the facts of this case, and as such, should be abated in full." We find no "glaring errors" in the MDOR's sales and income tax assessments. Rather, we affirm the chancellor's order upholding the MDOR's sales and income tax assessments for the reasons set forth above. Likewise, we find no error in the MDOR's assessment of penalties and interest as authorized by statute. As such, we affirm

34

the chancellor's decision on this issue.

## CONCLUSION

¶85.   For the reasons stated, we find no error in the chancery court's order granting the

MDOR's summary judgment upholding the sales tax assessment against Back Bay and the

individual income tax assessment against the Fountains, along with penalties and interest.

Accordingly, we affirm.

¶86.   **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., NOT PARTICIPATING.**